In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3395

Mary Anne Hedrich,

Plaintiff-Appellant,

v.

Board of Regents of the University
of Wisconsin System, et al.,

Defendants-Appellees.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 99-C-719-C--Barbara B. Crabb, Chief Judge.

Argued April 4, 2001--Decided December 19, 2001


  Before Coffey, Manion, and Diane P. Wood,
Circuit Judges.

  Diane P. Wood, Circuit Judge.  Mary Anne
Hedrich was an assistant professor in the
Department of Health, Physical Education,
Recreation and Coaching at the University
of Wisconsin at Whitewater (the
University). She was unsuccessful in her
effort to be awarded tenure, however, and
she eventually filed this suit alleging
violations of state and federal law. The
district court ultimately dismissed all
of her theories either under Rule
12(b)(6) or on summary judgment. Hedrich
appeals only the court's rulings on her
Title VII, equal protection, and liberty
interest in future employment counts. For
the reasons that follow, we affirm.

I

  Given the procedural route the case took
in reaching this court, we take the facts
in a light favorable to Hedrich. For
those parts of the case that were
dismissed under Rule 12(b)(6), this means
that we ask whether any set of facts
consistent with her complaint could be
presented that would entitle her to
relief; for those parts that were
dismissed on summary judgment, the
question is whether the facts before the
court, taken in the light most favorable
to Hedrich, would permit a reasonable

finder of fact to rule in her favor. In addition, for the summary judgment portion of the case we must first consider which facts were properly before the court. Rule 56(c) of the Federal Rules of Civil Procedure says that summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" show that there are no genuine issues of material fact and that the moving party is entitled to judgment on the law. In order to facilitate the court's consideration of supporting materials, however, most district courts have enacted local rules to impose some structure on the process. Here, Hedrich failed to follow those rules, and she may have paid a price for that. (We say "may" only because it is not at all clear that the court's enforcement of the local rules made any difference to the ultimate outcome; on the outside chance that it did, we have considered Hedrich's arguments on this part of the case.)

Once the University filed its motion for summary judgment, along with its supporting materials, it was up to Hedrich to show why genuine issues of material fact remained in the case. Although Hedrich did file a response to the University's motion, the court found fatal flaws in her "Response to Defendants' Proposed Findings of Fact and Conclusions of Law" and her "Proposed Additional Findings of Fact." Because both of these filings violated the court's local summary judgment procedures in significant respects, the court decided to disregard much of Hedrich's evidence and to treat as admitted many of the defendants' factual propositions. Hedrich contends that this action was an abuse of discretion, because her transgressions were merely technical. Our review of the record convinces us that Hedrich did indeed violate the local rules and that the court was within its discretion to impose the sanctions it did.

The district court found two principal problems with the response and proposed additional facts: first, they violated Western District of Wisconsin Local Rules I.C.2 and II.C.4, which require that factual propositions shall be set forth in numbered paragraphs, and to the

extent practicable, each paragraph shall state only one factual proposition ; and second, they failed to cite with specificity admissible evidence in support of the factual propositions she advanced. We agree. The purpose of the "numbered paragraphs" rule is to permit the district court to correlate factual propositions with the admissible evidence the party alleges supports her position. Hedrich's submissions did no such thing. Instead, she repeatedly offered long strings of factual propositions in single paragraphs that in some cases stretched on for pages. In some instances, these paragraphs did not even cast doubt on the defendants' proposed facts. Hedrich takes issue with the court's criticism of her citations, but again, she misses the point. While she literally provided citations, they were not in the form called for by the rule and they did not serve the purpose of the rule. Instead, they tended to be string citations at the end of paragraphs containing numerous factual propositions, again often stretching over more than one page. In several instances she concluded a factual statement with only a cross- citation to another fact paragraph that was itself pages long and improperly supported. These citations provided the court no guidance as to which factual propositions could be located where in the record. Not only were these real offense[s] against the local rules, it is precisely to prevent this type of rambling summary judgment submission that such rules exist. Markham v. White, 172 F.3d 486, 490 (7th Cir. 1999) (explaining that strict enforcement of local rules is necessary to allow the court to organize the evidence and identify undisputed facts).

In light of these problems, we cannot say that the district court abused its discretion by choosing an unduly harsh sanction. To the contrary, it is common to punish a party's failure to comply with summary judgment rules by ignoring that party's unsupported factual allegations and accepting as true those of the opposing party. See, e.g., Midwest Imports, Ltd. v. Coval, 71 F.3d 1311, 1313 (7th Cir. 1995) (failure to properly contest factual assertions under local rules constitutes binding admission of those facts); Bordelon v. Chicago Sch. Reform Bd. of Trs., 233 F.3d 524 (7th

Cir. 2000) (exclusion not too harsh where submissions undermine purpose of local rules). In this case, both the local rules and a separate reminder that the court issued to the parties left no question that the court would consider only evidence that was set forth in a proposed finding of fact with the proper citation. Hedrich does not claim that she was unaware of the rules or that the rules were not clear, nor does she offer any reasonable excuse for not complying with them. Under the circumstances, the sanction of exclusion was within the district court's discretion. Waldridge v. American Hoechst Corp., 24 F.3d 918, 921-22 (7th Cir. 1994) (collecting cases where strict enforcement of local summary judgment rules has been upheld). Finally, we do not find the district court's rulings too opaque to follow for purposes of appellate review. We thus consider this appeal on the basis of the record the district court found to be properly before it.

II

Hedrich was hired by the University in 1990 as a tenure-track faculty member of the Department of Health, Physical Education, Recreation and Coaching (the Department). When she joined the Department, the majority of the tenured faculty was female, but it also included some men, including Dr. Steven Albrechtsen. Years earlier, Albrechtsen had filed a sex discrimination claim against the University after it failed to promote him. Hedrich and Albrechtsen became friends.

In the late fall of 1995, Hedrich came up for tenure. At that time, the chairperson of the Department was James Miller. Defendant Brenda Clayton (also a tenured faculty member in the Department) succeeded him as chairperson in July 1996. Defendant H. Gaylon Greenhill was Chancellor of the University, defendant Kay Schallenkamp was Provost, and defendant Jeffrey Barnett was Dean of the College of Education (to which the Department belonged).

The tenured faculty in the Department met December 4, 8, and 18 of 1995 to review Hedrich's tenure file, which included materials related to her teaching (peer and student evaluations),

her scholarship (research, publications,presentations at professional associations), and her service and committee work for the University. Hedrich made an oral presentation to the committee on December 4, 1995. The committee ultimately rated Hedrich above average in teaching and service, but it gave her a below average rating for scholarly activity. Hedrich had submitted four manuscripts to national peer-reviewed journals for consideration, but none had yet been accepted for publication. At the time of the review, Hedrich had no publications to her credit despite the fact that Barnett had told her in two previous performance reviews that this would be a critical factor in her tenure decision. The committee voted 7 to 1 to deny Hedrich tenure. Only Albrechtsen voted in Hedrich's favor.

Miller reported the committee's decision to Dean Barnett and Chancellor Greenhill, explaining that the committee had discussed Hedrich's research and scholarly activity at length but found the four unpublished manuscripts to be insufficient to demonstrate the requisite degree of scholarly achievement. Barnett, in a memorandum to Chancellor Greenhill dated January 16, 1996, concurred in the committee's recommendation. That memorandum noted that Hedrich had failed to submit documentation of her teaching, research, and service achievements to the faculty committee. Barnett also noted the insufficiency of Hedrich's four unpublished manuscripts.

Hedrich received notice of the faculty committee's decision on January 16, 1996. On January 25, 1996, she received a letter from Provost Schellenkamp telling her that the 1996-97 academic year would be her last. Hedrich immediately sought an explanation from Miller for the decision and he cited her low rating for scholarly activity. Hedrich requested reconsideration by the faculty, but after two meetings the faculty reconfirmed its decision. Hedrich then appealed to the Faculty Grievance and Hearing Committee, which convened the Hedrich Tenure Review Appeals Panel (Appeals Panel).

The Appeals Panel, headed by Dr. Douglas Eamon, eventually issued a report to defendants Greenhill and Barnett on June

14, 1996. The report concluded that, contrary to Barnett's claim to Greenhill in his January 16 memorandum, there was no problem with the documentation Hedrich had submitted to the faculty committee about her scholarly, teaching, and service activities. It also concluded that the Department faculty committee's decision to deny tenure on the basis of Hedrich's having failed to publish any of her manuscripts in nationally peer-reviewed journals was not consistent with the performance criteria adopted by the department and stated in the University Handbook. Although the panel did not say so, it believed that this conclusion would require the empaneling of a so-called Notestein Review Committee.

Wisconsin law provides that tenure may be granted only where the Board of Regents receives an affirmative recommendation from the faculty member's department and from the university chancellor, unless a tenure appeals panel concludes that the department based its decision to deny tenure on impermissible factors. Wis. Stat. sec. 36.13(2)(a). In that case, an independent committee-- called a Notestein committee, after the state Assembly member who initiated the legislation creating these procedures-- may be convened to conduct an independent assessment of the candidate's qualifications. If that committee determines that the faculty member should receive tenure and the chancellor makes an affirmative recommendation to that effect, then the Board of Regents may grant tenure over the objection of the faculty member's department. Wis. Stat. 36.13(2)(b). One impermissible factor that may trigger a Notestein committee is the improper consideration of qualifications, such as the failure to consider available data bearing materially on the quality of performance. Wis. Admin. Code sec. UWS 3.08(1)(c).

When Greenhill received the Appeals Panel report, he decided that its findings did not warrant empaneling a Notestein committee. As Greenhill understood the system, the Wisconsin Administrative Code gives the chancellor the final say over how to proceed with an appellate panel's findings. See Wis. Admin. Code sec. UWS 3.08(3) ("The

decision of the chancellor shall be final on such matters"). In a June 28, 1996, memorandum, Greenhill reported to the Ap peals Panel, the Department, and to Hedrich that after reviewing the panel's report he saw no basis for convening a Notestein committee. Greenhill found nothing in the report to indicate that the Department had relied on impermissible factors in reaching its decision. He also concluded that Hedrich had not presented clear evidence that she met the scholarship requirements for tenure and affirmed the Department's decision.

Eamon, now joined by Richard Schauer, Chair of the Academic Freedom and Tenure Committee, strenuously objected to Greenhill's decision not to convene a Notestein committee. Their dispute turned on the proper interpretation of the Wisconsin statutes and administrative code. On October 25, 1996, after a series of memoranda failed to persuade Greenhill, the Appeals Panel amended its earlier report, explicitly finding that the Department had relied on impermissible factors in denying Hedrich tenure. Upon receiving the amended findings, Greenhill initially relented and agreed to return the matter to the Department for reconsideration.

The Department's tenured faculty, now led by defendant Clayton, objected to Greenhill's decision. They sent the Chancellor a letter in which they argued that Hedrich's request was not timely and that she had not demonstrated any rule violations in the tenure denial process. Ultimately, Greenhill agreed. In a November 22, 1996, memorandum to all parties involved, he explained that the appeals process was concluded and that the matter [of Hedrich's tenure] must now be considered closed. He cited his June 28, 1996, letter as the legally determinative final judgment in the matter.

Eamon and Schauer again challenged Greenhill's authority to close the matter without convening a Notestein committee. On January 17, 1997, with their support, Hedrich asked the Faculty Senate Executive Committee to commence a Notestein review. The Executive Committee agreed to convene an ad hoc credential review committee, over Greenhill's

strenuous objection, in the Spring of 1997. The Hedrich Credential Review Committee (CRC) considered the materials relevant to Hedrich's tenure that were before the Department at the time of its initial decision. On November 5, 1997, the CRC concluded that Hedrich had properly been denied tenure. Believing that the CRC had not followed proper procedures when considering her record, Hedrich appealed its decision to the Executive Committee of the Faculty Senate. The Executive Committee has not acted on the matter.

Hedrich began looking for alternative academic employment in the Spring of 1997. She applied for two positions that year. She applied for one position in the spring of 1998 and two that fall. Finally, she applied for two positions in 1999. All her applications were without success. Hedrich ultimately took a position as a staff nurse in Pewaukee, Wisconsin.

On September 1, 1998, Hedrich filed a complaint with the Wisconsin Personnel Commission (WPC) alleging gender, age, and sexual orientation discrimination. The WPC dismissed her complaint as not timely. It concluded that Hedrich did not file her charge until more than 300 days after any reasonable person would have known that her tenure application had been denied. Later in September of 1998, Hedrich filed the same charges with the EEOC. The EEOC also dismissed her complaint as untimely.

Hedrich then filed suit in Wisconsin state court. The defendants removed the case to federal court. Hedrich's complaint alleged several violations of law. She alleged that defendants discriminated against her on the basis of "gender, sexual orientation, and age" in violation of 42 U.S.C. sec. 2000 et seq. and 29 U.S.C. sec. 623 et seq., and that defendants deprived her of her "constitutionally protected liberty interest in her good name and reputation without due process of law." The district court also construed Hedrich's complaint as stating an equal protection claim. Defendants filed motions to dismiss on the pleadings and on summary judgment; they succeeded in their effort to win summary judgment. Hedrich now appeals all adverse rulings except the one dismissing

the age discrimination theory.

III

A.  Title VII

   Hedrich's theory of sex discrimination in her unsuccessful bid for tenure rests on the idea that the defendants were motivated by her association with a male employee who had earlier filed a sex discrimination claim against the University, Dr. Albrechtsen. In support of her  associational discrimination theory, Hedrich cites Drake v. Minnesota Mining & Mfg. Co., 134 F.3d 878 (7th Cir. 1998) and Moffett v. Gene B. Glick Co., 621 F.Supp. 244 (N.D. Ind. 1985). We need not decide whether this is really a sex discrimination theory, if it is really a retaliation theory, or if there was adequate factual support for it either way, because Hedrich's complaint to the WPC was filed too late.

   Hedrich had 300 days from the time she suffered her adverse employment action-- the denial of tenure--to file her complaint with the WPC or the EEOC. See Alexander v. Wisconsin Department of Health and Family Services, 263 F.3d 673, 680 n.1 (7th Cir. 2001); 42 U.S.C. 2000e-5(e). She filed her complaint with the WPC on September 1, 1998, meaning that her adverse employment action was actionable only if it occurred on or after November 5, 1997. Because under Wisconsin law the Board of Regents may grant tenure only when it has an affirmative recommendation from a university chancellor, the district court concluded that Hedrich should have known no later than her receipt of Greenhill's June 28, 1996, memorandum that her tenure application had been denied. Citing the Supreme Court's opinion in Delaware State College v. Ricks, 449 U.S. 250 (1980), the court found that the mere fact that Hedrich had avenues available (or created avenues) to appeal Greenhill's decision did not alter the fact that his decision was final for purposes of the limitations period on her Title VII claim. As the Supreme Court put it in Ricks,
 entertaining a grievance complaining of the tenure decision does not suggest that the earlier decision was in any respect tentative.  449 U.S. 505-06. While it is also possible that Greenhill's decision was not final until his memorandum of

November 26, 1996, in which he declared the Hedrich tenure matter to be closed, that date is also far too early to be included within Hedrich's Title VII complaint.

Despite Hedrich's tardy filing, the district court declined to dismiss Hedrich's Title VII claim on timeliness grounds. It found that she had made a plausible assertion of estoppel. We think this conclusion cannot be squared with Ricks. In order to make out a claim for equitable estoppel, the plaintiff must present evidence that the defendant [took] active steps to prevent the plaintiff from suing in time. Hentosh v. Herman Finch Univ., 167 F.3d 1170, 1174 (7th Cir. 1999). These steps must amount to "a deliberate design by the employer or . . . actions that the employer should unmistakably have understood would cause the employee to delay filing his charge." Mull v. ARCO Durethene Plastics, Inc., 784 F.2d 284, 292 (7th Cir. 1986). They are typically acts of wrongdoing such as hiding evidence or promising not to rely on a statute of limitations defense. Cada v. Baxter Healthcare Corp., 920 F.2d 446, 450-51 (7th Cir. 1990). In this case, the only steps taken by the University after June 28, 1996, were those initiated by Hedrich in her effort to appeal Greenhill's decision. No reasonable jury could conclude that these were acts of wrongdoing undertaken by the University to dissuade Hedrich from filing a Title VII claim. Moreover, if permitting Hedrich to appeal the Chancellor's concededly final tenure decision was a step to prevent plaintiff from suing in time, then any time a faculty member took advantage of an opportunity to appeal an adverse tenure decision within her university system the Title VII statute of limitations would be tolled. This is exactly the proposition that was proposed and expressly rejected in Ricks. 449 U.S. at 261.

Other than permitting Hedrich to invoke the University system's internal appeals procedure, none of the defendants in this case did anything to suggest to her that Greenhill's June 28, 1996, decision and his emphatic affirmation of that decision in November of 1996 were anything other than final. Although the question of when a tenure decision becomes final for Title VII purposes can be a difficult one, it

is not a problem here. The only question is whether permitting a tenure applicant to pursue avenues of appeal after a final adverse tenure decision is enough to raise a triable issue of equitable estoppel. It is not. This leaves us with our earlier conclusion: Hedrich's Title VII claim was not timely filed and was thus properly dismissed.

B.    Equal Protection Violation

Hedrich also raised two claims under 42 U.S.C. sec. 1983: the first was an equal protection claim, which she brought against only the individually named defendants and not the Board of Regents, in which she asserted that the process by which her tenure decision was made constituted a denial of her rights under the Equal Protection Clause; the second was a due process claim (also against only the individuals), which we address below. The district court offered tworeasons for dismissing the equal protection claim: first, that Hedrich had not adequately alleged that a conspiracy existed between the named defendants, and second, that she failed to present sufficient evidence of an equal protection violation to survive summary judgment because she had adduced  no evidence to show that she was treateddifferently from any other similarly situated candidate  or that the defendants were  motivated by the intent to discriminate against persons such as plaintiff.  We affirm on the basis of the second of these reasons.

There is no dispute that part of Hedrich's employment contract with the University included a promise by the Uni versity to consider her for tenure. And we agree that the process by which her tenure application was decided is subject to scrutiny under the equal protection clause. See, e.g., Gregory v. Ashcroft, 501 U.S. 452 (1991) (considering whether mandatory retirement age for judges violates the Equal Protection Clause). In order to make out an equal protection claim, however, Hedrich had to present evidence that the defendants treated her differently from others who were similarly situated. She also had to present evidence that the defendants intentionally treated her differently because of her membership in the class to which she belonged. See Personnel Adm'r

of Mass. v. Feeney, 442 U.S. 256, 279 (1979); Nabozny v. Podlesny, 92 F.3d 446, 453 (7th Cir. 1996). Finally, where, as here, Hedrich alleges that she was a class of one --a heterosexual female professor who befriended Dr. Albrechtsen, a heterosexual male professor who had previously filed a sex discrimination complaint--it was her burden to show that the defendants justification for discriminating against her was irrational and arbitrary. Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).

We agree with the district court that Hedrich did not present competent evidence on several of these elements. In particular, while she offered evidence that the criteria the faculty applied in assessing her scholarship were not consistent with those set out in the University Handbook, she had nothing to indicate that other tenure applicants in the Department were not assessed according to the same allegedly erroneous criteria. Hedrich also failed properly to present any evidence to support her claim that the real reason that each of the defendants acted to deny her tenure was to punish her for her friendship with Dr. Albrechtsen. To the contrary, the record reveals that male and female faculty members alike (including the male chairperson) voted to deny her tenure, and she has no theory to explain why the male members might have resented the heterosexual friendship. With no evidence on these two critical points, the court properly dismissed Hedrich's equal protection claim.

C.  Liberty Interest

Hedrich last contends that the defendants actions in denying her tenure deprived her of her liberty interest in pursuing her chosen career, in violation of her due process rights. As we explained recently,  if the character and circumstances of a public employer's . . . conduct or statements are such as to have destroyed an employee's freedom to take advantage of other employment opportunities, the employee can bring suit based on the deprivation of his freedom to pursue the occupation of his choice.  Bordelon, 233 F.3d at 531.

In order to reach a jury on her liberty interest claim, Hedrich first had to present evidence that the defendants

engaged in conduct that was so stigmatizing that it crossed the line from mere defamation, which is not actionable under the Constitution, see Paul v. Davis, 424 U.S 693, 701 (1976), over to an infringement of a liberty interest. The denial of tenure or employment is not, by itself, stigmatizing conduct in the legal sense of the term. Wooten v. Clifton Forge School Bd., 655 F.2d 552, 555 (4th Cir. 1981) (no liberty interest claim arises merely from denial of tenure). As we explained in Lawson v. Sheriff of Tippecanoe County, 725 F.2d 1136, 1138-39 (7th Cir. 1984), a termination is only stigmatizing if it is accompanied by a publicly announced reason that impugns [the employee's] moral character," id. at 1138, or implies "dishonesty or other job- related moral turpitude  id. at 1139. See also Board of Regents of State Colleges v. Roth, 408 U.S. 564, 573 (1972).

Hedrich urges that she was stigmatized by the defendants  statements that she did not meet Whitewater's standards of scholarship. This inference can be drawn, however, from practically every denial of tenure or termination.  Labeling an employee as incompetent or otherwise unable to meet an employer's expectations does not infringe the employee's liberty.  Head v. Chicago Sch. Reform Bd. of Trustees, 225 F.3d 794, 801 (7th Cir. 2000). Alternatively, Hedrich contends that she was stigmatized by the defendants  claims that she did not submit the relevant documentation for consideration by the faculty. This, she argues, portrays her to be  a dolt.  The district court found that no properly presented evidence could support the proposition that the defendants' statements were false. See Strasburger v. Board of Education, 143 F.3d 351, 356 (7th Cir. 1998). Even assuming that Hedrich did present such evidence, however, these statements do not suggest the kind of moral turpitude or dishonesty that would give rise to a liberty interest claim.

If Hedrich could identify stigmatizing statements made by her employer, she would then have to provide evidence that these were made public and that as a result it was  virtually impossible for [her] to find new employment in [her]

chosen field.  Head, 225 F.3d at 801. Hedrich cannot satisfy either of these requirements. The only evidence she points to is the fact that over three years she applied for seven academic jobs and was not hired. From this she believes that a reasonable jury could infer that the defendants were publicly defaming her and that it was virtually impossible for her to find an academic position. Anyone familiar with the academic job market knows that failing to receive a tenure track position after only seven applications is commonplace, even under the best of circumstances. There is also no question that once a person has been denied tenure, finding another academic position is considerably more difficult; failing on seven attempts in that case is not surprising. Nonetheless, Hedrich's evidence could not be construed by a trier of fact to show that the consequences of her tenure denial have been any more severe than any other professional's failure to receive a desired promotion. Hedrich's liberty interest claim was properly denied.

IV

  We recognize that the denial of tenure is a serious matter for someone who is trying to pursue an academic career. It is possible--though we express no opinion on the point-- that Hedrich's tenure application could have been handled better. The University may have lost a quality faculty member. But on the record before us, no reasonable jury could conclude that Hedrich's denial of tenure violated her rights under federal law. We therefore Affirm.