# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 04-1056

PAUL FENJE, M.D.,

*Plaintiff-Appellant,*

v.

JAMES FELD, M.D., in his official
capacity and in his individual capacity,

*Defendant-Appellee.*

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 01 C 9684—**William T. Hart**, *Judge.*

———————

ARGUED SEPTEMBER 22, 2004—DECIDED FEBRUARY 15, 2005

———————

Before COFFEY, WILLIAMS, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Dr. Paul Fenje was accepted into the anesthesiology residency program at the University of Illinois at Chicago (UIC). Shortly thereafter, but before the residency began, the program's director learned that Dr. Fenje had been terminated from a previous residency because of questions about his competency. Based on his lack of candor in the application process (he had not disclosed his dismissal from the prior residency), Dr. Fenje was dismissed from the UIC program. Fenje responded with this lawsuit against the program's director, Dr. James Feld, alleging that the termination of his residency violated his due process and equal protection rights under the Four-

teenth Amendment to the United States Constitution. The district court granted summary judgment to the defendant and Fenje appeals. We affirm.

## I. Background

Dr. Fenje is an Irish national who attended medical school in Ireland. In August 1999 he commenced work as a resident in emergency medicine at a hospital in Scotland. A mere twelve days after this residency began, Fenje was dismissed from the program because his attending physician had "questioned his competency to deliver patient care" and did not consider Dr. Fenje's practice of medicine to be commensurate with the program's requirements. Dr. Fenje promptly initiated litigation in Scotland, alleging breach of contract on the part of the hospital.

In June 2000 Dr. Fenje applied for admission to the anesthesiology residency program at UIC. Nowhere in the materials submitted as part of his application did Dr. Fenje mention his past association with the Scottish hospital, the difficulties he had encountered there, or his ongoing litigation against the hospital. Dr. Feld conducted a personal interview with Dr. Fenje and asked if there was anything he should know about Dr. Fenje's background, including any work performed in previous training programs and whether Dr. Fenje had any "skeletons in his closet." Dr. Fenje responded that there was nothing that Dr. Feld needed to know. A few days after the interview, Dr. Fenje followed up with an e-mailed letter to Dr. Feld confirming that "there are no skeletons of any kind in any of my closets here." Fenje's letter went on to specifically state that he did not smoke, drank alcohol very infrequently, had never used illegal drugs, and had never been arrested or charged with any crime more serious than a single speeding ticket. Dr. Fenje was accepted into

the anesthesiology training program. A June 19, 2000, letter from Dr. Feld confirmed his acceptance in writing and indicated a start date of August 1, 2000.

On or about July 17, 2000, Dr. Fenje received and executed a "Resident Agreement." This document stated in part that in the event the university were to dismiss Dr. Fenje from the training program for cause, Fenje would receive written notice; could request a hearing; the hearing would be convened before "a committee"; Fenje and a representative of the anesthesiology department would be permitted to submit oral and written materials in support of their respective cases (but no attorneys would be allowed); and the committee would issue a written decision that could be appealed to the Associate Dean of Graduate Medical Education.

A few days after Dr. Fenje's Resident Agreement was executed, Dr. Feld received an anonymous telephone call disclosing that Dr. Fenje had experienced "difficulties" at a residency program in Scotland and suggesting that Dr. Feld contact the director of the program for further information. Dr. Feld followed up with calls to the director of the Scottish residency program and Dr. Fenje's supervising physician and was informed of the circumstances surrounding Dr. Fenje's termination. In a telephone conversation in late July, Dr. Feld confronted Fenje with this information, and Fenje was given the opportunity to respond and state his position. Fenje characterized his difficulties in Scotland as a clash of personalities between himself and the director of the program, who, according to Fenje, had wrongfully concluded that Fenje suffered from a "psychiatric obsessive trait" and that his practice of medicine was "unsafe." In a follow-up letter to Dr. Feld dated August 1, 2000, Dr. Fenje restated his view of the events culminating in his dismissal from the Scottish training program, adding that "I had never considered this incident any kind of a closet skeleton and had thought of it as a personality clash of some

kind . . . ."

Dr. Feld consulted with other members of the anesthesiology department and obtained their approval to terminate Fenje's residency because of his dishonesty in the application-and-interview process. Dr. Feld reasoned that a doctor who has demonstrated a propensity to be less than forthcoming concerning negative incidents in his work history cannot be relied upon to communicate forthrightly with supervising physicians on matters concerning patient care. Dr. Feld called Fenje on August 4, 2000, and informed him that he was terminated from the residency program. Dr. Fenje was not provided with a written notice of termination at this time. In the two-month period following his termination, Dr. Fenje wrote letters and e-mails to Dr. Feld and Dr. Ronald Albrecht, the director of the anesthesiology department, asking that the decision be reconsidered and that Drs. Feld and Albrecht undertake a broader inquiry before making a final decision. The decision was final, however, and no "broader inquiry" was undertaken.

For reasons not made clear in the record, the UIC College of Medicine did not provide Dr. Fenje with formal *written* notice of his termination from the residency program until more than two years after he was orally notified of the decision by Dr. Feld. In the written notice signed by Dr. Albrecht, Dr. Fenje was once again informed that he had been dismissed from the program due to his lack of candor in the application process, and that in the opinion of the anesthesiology department, this shortcoming rendered him unsuitable for residency training at UIC. The notice also informed Dr. Fenje that he could request a hearing pursuant to the terms of the Resident Agreement. Dr. Fenje requested a hearing in a timely manner, and one was convened on March 3, 2003, before a three-member committee comprised of physicians in the UIC anesthesiology department. Evidence and argument were submitted by Drs. Fenje and Feld without the participation of attorneys,

and the committee thereafter voted unanimously to uphold the termination on the grounds of lack of candor in the application process. The Vice Dean of the College of Medicine upheld the decision on Dr. Fenje's appeal.

Dr. Fenje filed this action pursuant to 42 U.S.C. § 1983, alleging due process and equal protection violations. Specifically, the complaint alleged that Dr. Fenje was denied due process of law because there was no pretermination hearing, his posttermination hearing was unjustifiably delayed, his Resident Agreement was flawed for failing to prescribe a time frame following termination within which a posttermination hearing was required, and his dismissal wrongfully imposed a stigma upon him that foreclosed other educational and/or vocational opportunities. The complaint also alleged a violation of Dr. Fenje's right to equal protection on the ground that his termination was undertaken solely by virtue of Dr. Feld's personal animus toward him.[1]

The district court dismissed the case on Dr. Feld's motion for summary judgment, holding that Fenje was only entitled to notice of the grounds for the termination decision and an opportunity to respond, and that Fenje had been afforded at least this much process. *Fenje v. Feld,* 781 F. Supp. 2d 781, 802 (N.D. Ill. 2003). As to the delay in convening the hearing, the court held that no posttermination hearing was constitutionally required, and so the delay could not constitute a due process violation. *Id.* at 803-04. In the alternative, the court held that Fenje was not prejudiced by the delay, and that the delay could not be attributable to Dr. Feld in any event. *Id.* at 805. The court dismissed Fenje's claims of "stigmatiza-

---

[1] The complaint also alleged a state law claim for tortious interference with contract that was dismissed by the district court. Dr. Fenje has not appealed the dismissal of the state law claim.

tion" because the stated reason for his dismissal was not false, and he was therefore not defamed by the defendant's actions. *Id.* at 806. Fenje's equal protection claim was dismissed because there was no evidence that Dr. Feld had acted out of vindictiveness or other malevolent animus. *Id.* at 807.

## II. Discussion

### A. Procedural Due Process

On appeal, Dr. Fenje reasserts his argument that his right to due process was violated because he received no pretermination hearing, his posttermination hearing was unreasonably delayed, and the Resident Agreement did not contain a provision that required his posttermination hearing to be held within a reasonable time after termination. A plaintiff asserting the inadequacy of procedural safeguards must first establish that the defendant's actions deprived him of either a liberty or a property interest recognized by law. *Bd. of Regents v. Roth*, 408 U.S. 564, 569 (1972). The district court concluded that Dr. Fenje possessed a property interest in his continued participation in the residency program, and this conclusion has not been challenged on appeal. We therefore assume for purposes of this appeal that Dr. Fenje's dismissal deprived him of either a liberty or property interest. We conclude that summary judgment was properly granted because Fenje was provided with at least as much process—more, actually—as was required by the Fourteenth Amendment.

In *Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78 (1978), the Supreme Court considered the quantum of due process owed by a state-run university to a dismissed medical student. The Court distinguished between dismissals from educational institutions on the basis of an "academic" rationale and those that may properly be characterized as "disciplinary." *Id.* at 89-90. The

Court held that the dismissal of the medical student in *Horowitz* was "academic" rather than "disciplinary" because it "rested on the academic judgment of school officials that she did not have the necessary clinical ability to perform adequately as a medical doctor[.]" *Id.* at 89-90. The Court further noted that an academic dismissal is one that involves "a school's determination of whether a student will make a good doctor," and the school's consideration of a student's personal attributes—in *Horowitz* they were hygiene and the ability to keep to a clinical schedule—may permissibly factor into this "academic" decision. *Id.* at 91 n.6. More broadly, the Court characterized an academic dismissal as one being "more subjective and evaluative" than the "typical factual questions presented in the average disciplinary decision." *Id.* at 90. Academic dismissals, requiring as they do the "expert evaluation . . . [and] historic judgment of educators," bear "little resemblance to . . . judicial and administrative fact-finding proceedings." *Id.* at 89-90.

Disciplinary dismissals, by contrast, are those involving "the violation by a student of valid rules of conduct" or "disruptive and insubordinate behavior." *Id.* at 86, 90. Disciplinary dismissals, being more objective in nature and not dependent upon the analytical expertise of professional academicians, will bear a "resemblance to traditional judicial and administrative factfinding[.]" *Id.* at 88-89.

We have no difficulty concluding that Dr. Fenje's dismissal falls within the ambit of an academic dismissal. It is undisputed that prior to his acceptance by UIC, Dr. Fenje failed to disclose his participation in the Scottish residency program, much less his abrupt and unceremonious dismissal from the program and his subsequent lawsuit against the hospital. His omission of this information in his application and interview arose in circumstances in which disclosure was clearly called for; Fenje was specifically

asked to disclose anything in his background that might have a bearing on his candidacy for the UIC residency program—including any "skeletons in the closet"—and assured Dr. Feld that there were "no skeletons of any kind in any of my closets." Dr. Feld and his fellow anesthesiology faculty members interpreted Fenje's dishonesty in the application process as undermining his future credibility as a source of information concerning the care of seriously ill patients. As explained by Dr. Feld in his oral testimony at the termination hearing:

> For most [residents], we can teach them the clinical skills as well as knowledge to become a good anesthesiologist. What we cannot teach is a sense of honesty, being up front, fair play and communicating well. These are traits well established and ones that we insist upon in our incoming residents. We are constantly placed in life and death situations. I don't expect a resident to know everything, but at least to be honest about the situation, clinical data and outcome. *Any sense of coverup or not relaying all the information to me may endanger patient lives.* In Fenje's case, his total disregard to tell me about his dismissal at Arie Hospital in his application, his CV or when point blank asked about previous problems made him unfit to fulfill the role of an anesthesia resident in our program. (Emphasis added).

The nexus between Dr. Fenje's lack of candor in the application process and his capacity to be trusted with patient care clearly pushes this decision into the realm of an academic dismissal. Dr. Feld made a professional judgment that a doctor-in-training who has demonstrated a willingness to withhold damaging information when it serves his purposes cannot be fully trusted to convey all information crucial to the health of the patients committed to his care. As in *Horowitz*, this represents an academic judgment by school officials, expert in the subjective

evaluation of medical doctors, that Dr. Fenje did not possess the attributes necessary to adequately perform his clinical duties as an anesthesiology resident.

Dr. Fenje argues that his termination was disciplinary, not academic, on the strength of the District Court of Utah's holding in *Roach v. University of Utah*, 968 F. Supp. 1446 (D. Utah 1997). In that case, the court found a graduate student's dismissal from a master's degree program to be disciplinary where the dismissal was based upon the university's conclusion that the student had provided misleading information on his admission forms. *Id.* at 1453. However, in *Roach*, unlike the present case, there was no academic justification for the dismissal whatsoever. The student in *Roach* received a letter from the school informing him that his admission to the graduate program had been rescinded, effective immediately, on the sole basis that he had provided inaccurate information on his admission form. The school did not provide any further explanation or justification for the student's dismissal, and the court explicitly grounded its finding of a disciplinary dismissal on the fact that "there is no evidence that . . . inability to perform the work required by [the graduate program] . . . or any failings whatsoever of an academic nature influenced [the school's] decision to suspend Roach." *Id.* As discussed above, Dr. Fenje's lack of candor was explicitly linked to his ability to adequately perform the duties of a resident. *Roach* consequently does not support Dr. Fenje's position.

Our holding that Dr. Fenje's dismissal was "academic" is consistent with this court's decision in *Martin v. Helstad*, 699 F.2d 387 (7th Cir. 1983), in which a student's acceptance to law school was revoked on the grounds that he had failed to disclose information in his application relating to past criminal history. Our opinion in *Martin* did not delve into the school's rationale for revoking the plaintiff's acceptance other than to note that it was accomplished "on

the grounds that the appellant's application had failed to disclose his federal conviction[.]" *Id.* at 391.[2] However, in the course of discussing *Horowitz*'s distinction between academic and disciplinary dismissals, we commented on a scenario in which such a dismissal would fall into the realm of the academic:

> To the extent that the Law School's reconsideration of the appellant's acceptance to the Law School represented a *reconsideration of his suitability as a law student and potential lawyer*, then the revocation of his acceptance can be analogized more closely to an academic than it can be to a disciplinary dismissal.

*Id.* at 391 (emphasis added).

Thus, the ingredient missing in *Roach* and only lurking around the edges of *Martin* is squarely and fully presented in this case—Dr. Fenje's dismissal was based upon the academic judgment of school officials that he was ill-equipped to perform the work required of an anesthesiology resident. His dismissal was therefore academic in nature.

In the case of academic dismissals, procedural due process does not require any form of hearing before a decision-making body, either before or after the termination decision is made. *Martin*, 699 F.2d at 391; *Horowitz*, 435 U.S. at 87-91. In an academic dismissal it is sufficient that the student was informed of the nature of the faculty's dissatisfaction

---

[2] *Martin* was an appeal from the district court's denial of a preliminary injunction, and our review was consequently confined to the question of whether the lower court had abused its discretion in reaching its injunction decision. *Martin*, 699 F.2d at 389. Given this lesser standard of review, we did not find it necessary to definitively determine whether Martin's dismissal was academic or disciplinary, and went no further, for purposes of abuse of discretion analysis, than finding that the law school's action was "colorably an academic dismissal." *Id.* at 391.

and that the ultimate decision to dismiss was "careful and deliberate." *Horowitz*, 435 U.S. at 85.

Here, Dr. Fenje plainly received a greater degree of procedural due process than required under the circumstances. He was fully informed of Dr. Feld's concerns and provided an opportunity to give his side of the story in an effort to dissuade Dr. Feld from dismissing him from the program. Dr. Fenje took advantage of this opportunity both orally and in writing. Dr. Feld reached a "careful and deliberate" decision that Fenje was not suited for anesthesiology residency training at UIC because of his lack of candor. Although a posttermination hearing was not constitutionally required, Dr. Fenje ultimately received a full-blown posttermination hearing before an academic committee and a subsequent administrative appeal. Dr. Fenje cannot complain that a hearing to which he had no entitlement was not convened in a timely manner, or that his contract should have required that a hearing be held within a specified time frame. The district court properly granted Dr. Feld's summary judgment motion on this claim.

### B. Liberty Interest in the Pursuit of Occupation

Dr. Fenje argues that the district court erred in dismissing his claim that Dr. Feld violated his liberty interest in being free from a stigmatizing dismissal without due process of law. The precise legal framework under which Fenje brings this claim is not entirely clear from his scanty briefing and argument on this issue. It is true that "state employees have a liberty interest in not being discharged from their employment while being defamed such that they cannot get other government employment." *Strasburger v. Bd. of Educ.*, 143 F.3d 351, 356 (7th Cir. 1998). This court has also held that "when a state actor attacks a person's good name in a manner that makes

it 'virtually impossible' for the person to find new employment, that person's liberty interest to pursue his occupation is infringed." *Beischel v. Stone Bank Sch. Dist.*, 362 F.3d 430, 439 (7th Cir. 2004). In yet another formulation, we have stated that "if the character and circumstances of a public employer's . . . conduct or statements are such to have destroyed an employee's freedom to take advantage of other employment opportunities, the employee can bring suit based upon the deprivation of his freedom to pursue the occupation of his choice." *Hedrich v. Bd. of Regents*, 274 F.3d 1174, 1183 (7th Cir. 2001).

Dr. Fenje's claim fails for numerous reasons, but it is sufficient for our purposes to note that a claim alleging the abridgement of a liberty interest in being free from a "stigmatizing dismissal" at the hands of a public employer requires, as a necessary element of the constitutional tort, that a public official made false, defamatory statements of fact about the plaintiff and the reasons for his termination. *Strasburger*, 143 F.3d at 356; *Hedrich*, 274 F.3d at 1184; *Beischel*, 362 F.3d at 439. The district court recognized this required element and granted summary judgment because the record contains no facts supporting it. Dr. Fenje does not address this deficiency in his appellate brief and makes no attempt to explain exactly when, where, or to whom Dr. Feld made false factual statements concerning Dr. Fenje's dismissal from the UIC program. If Dr. Feld could be said to have publicized the reasons underlying Dr. Fenje's dismissal at all (Fenje does not identify facts to show that this occurred), Dr. Feld's reasons were demonstrably and indisputably *true*: Dr. Fenje was not forthcoming about his dismissal from the residency at the Scottish hospital. The district court properly granted summary judgment to the defendant on this claim.

### C. Equal Protection Claim

Dr. Fenje also alleged that his right to equal protection was violated because his termination was accomplished solely by virtue of Dr. Feld's "ill will, animus . . . retribution or spite" toward him. This is an attempt to bring this case within the holding of *Esmail v. Macrane*, 53 F.3d 176 (7th Cir. 1995), in which we stated that an "orchestrated campaign of official harassment directed against [the plaintiff] out of sheer malice," "vindictiveness," or "malignant animosity" would state a claim for relief under the Equal Protection Clause. *See also Nevel v. Vill. of Schaumburg,* 297 F.3d 673, 681 (7th Cir. 2002); *Hilton v. City of Wheeling*, 209 F.3d 1005, 1008 (7th Cir. 2000) (so-called "vindictive action" equal protection cases require proof of "a totally illegitimate animus toward the plaintiff by the defendant.") The district court held that the record was barren of any evidence from which an inference of vindictiveness or ill will could be derived.

On appeal, Dr. Fenje suggests that Dr. Feld's decision to terminate him based upon a lack of candor in and of itself is proof that the dismissal was the by-product of personal animosity on the part of Dr. Feld. Although Dr. Fenje does not say it in so many words, he must be arguing that Dr. Feld was so personally offended upon his discovery of Dr. Fenje's duplicity that Dr. Feld engaged in a scheme to retaliate against Dr. Fenje by securing his dismissal from the residency program. The district court was correct that there is not a shred of evidence in the record to support a pejorative characterization of Dr. Feld's motivation. As we have noted, Dr. Feld's decision was reached after consultation with his peers in the anesthesiology department and was based upon a legitimate academic concern for Dr. Fenje's prospective ability to be entrusted with the care of patients. There is no evidence of spite or malignant animosity. Summary judgment dismissing this claim was appropriate.

### D. Discovery and Evidentiary Issues

Dr. Fenje has raised a host of objections to discovery and evidentiary decisions by the district court. We need not address these issues. The salient facts are few and undisputed: (1) Dr. Fenje was asked at his interview to describe his past work experience and to disclose any "skeletons in his closet"; (2) Dr. Fenje omitted any reference to his dismissal from the residency program in Scotland in response to the interview questioning; (3) upon discovery of the withheld information, Dr. Fenje had an opportunity to explain why he did not disclose his prior work history and why his nondisclosure should not affect his association with UIC; and (4) Dr. Feld and his colleagues in the anesthesiology department reached a professional academic judgment that Dr. Fenje's dishonesty rendered him unfit for future training at UIC.

We have concluded that summary judgment was properly granted based upon the foregoing undisputed facts; Dr. Fenje's discovery and evidentiary arguments are therefore superfluous. Fenje challenges the district court's order denying access to UIC's files on other residency applicants; the contents of other residents' files have no bearing on our evaluation of what process Dr. Fenje was due or whether Dr. Feld made any false statements about Fenje's termination or harbored any personal animosity toward him. Fenje also contends that a variety of documents relied upon by the district court lacked proper authentication; none of these are essential to our decision and summary judgment would have been proper even if the content of these documents had been disregarded. This is not to say that the district court erred in any respect in its extremely thorough and painstaking rejection of Dr. Fenje's evidentiary objections in the ten-page appendix to its published opinion. *See Fenje*, 301 F. Supp. 2d at 809-19. Rather, we conclude only that we need not undertake review of these aspects of the district court's decision in light of our decision on the merits of the

summary judgment.

AFFIRMED.

A true Copy:

    Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*