NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued September 22, 2020
Decided March 19, 2021

**Before**

DIANE S. SYKES, *Chief Judge*

JOEL M. FLAUM, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

| | |
|---|---|
| No. 20-1530 | |
| | Appeal from the United States District |
| VAUN MONROE, | Court for the Northern District of Illinois, |
| *Plaintiff-Appellant,* | Eastern Division. |
| | |
| *v.* | No. 1:17-cv-05837 |
| | |
| COLUMBIA COLLEGE CHICAGO | Thomas M. Durkin, |
| and BRUCE SHERIDAN, | *Judge*. |
| *Defendants-Appellees.* | |

## O R D E R

After he was denied tenure at Columbia College of Chicago, Vaun Monroe sued Columbia and his former department chairperson, Bruce Sheridan, on various federal claims of race discrimination and on state law theories. The district court resolved all of the claims in favor of the defendants on motions to dismiss and for summary judgment. A separate opinion issued contemporaneously with this order resolves Monroe's Title VI claim. In this order, we affirm the judgment as to his other claims.

**I.**

Monroe was hired by Columbia College as a tenure-track faculty member in 2007. He was the first Black man hired as a tenure-track instructor in the college's film and video department. Sheridan was the chairman of that department.

During his first year, Monroe received several negative course evaluations. (Among other criticisms, some students objected to his focus on works by Black artists.) Sheridan met with Monroe to discuss the evaluations. Monroe, concerned about the weight Sheridan was placing on student evaluations, pointed out that the criticisms might be the result of implicit bias against faculty members of color. Sheridan accused him of "playing the race card" and not assuming responsibility for his classroom. During Monroe's second year, a student created a racially-charged website about him, which department personnel told him to ignore.

Monroe underwent a formal review in his third year as a tenure-track faculty member, which was designed both to give him feedback on his performance and produce a recommendation as to whether he should continue on the tenure track or be terminated. Sheridan participated in (indeed, directed) the faculty review despite questions as to whether he should do so as department chair; he raised the issue of Monroe's critical student evaluations. The participating faculty members ultimately voted yes/no on each of three performance areas considered for tenure: Monroe received zero yes votes on teaching and curriculum development, 16 yes votes and one no vote on creative or scholarly work, and nine yes and eight no votes on community service. Sheridan and the Dean of Media Arts subsequently prepared reports which raised concerns about Monroe's teaching. Academic Affairs Vice President Louise Love declined to renew Monroe's appointment for the following year. But Monroe filed a successful grievance challenging that decision principally on the ground that no tenured faculty members had observed his classroom performance as the College's evaluation procedures specified. Columbia President Warrick Carter reversed the decision not to renew Monroe's contract for the 2011-2012 academic year.

Monroe alleges that following Carter's reversal, Sheridan was hostile to Monroe and retaliated against him by, *inter alia*, assigning him to teach only introductory-level classes, assigning a white male with lesser qualifications to teach graduate-level directing courses (where Monroe had previously received his best evaluations), choosing white non-tenure track lecturers to fill various screenwriting and administrative program coordinator provisions, and engaging in "hyper-surveillance" of Monroe and threatening him with investigations (that never materialized) of even minor infractions.

When Monroe's tenure evaluation began in 2012, the reviewing department faculty approved his tenure application by a vote of 9-5. Although their report cited

continuing concerns that Monroe did not provide timely feedback to students and respond to student communications, it indicated that his teaching and teaching-related performance had improved substantially. Sheridan, who did not participate in that review, wrote a separate, eight-page memorandum as Monroe's department chair acknowledging improvements in Monroe's performance while indicating that substantial concerns remained regarding his reliability and punctuality, the discharge of his duties as to student advising, and the thoroughness of his teaching methodology. Sheridan also excerpted a negative student evaluation from a course where the comments otherwise were overwhelmingly positive. Sheridan opined that Monroe's performance in teaching and teaching-related activity did not meet the requirements for tenure.

The All College Tenure Committee voted unanimously to deny Monroe tenure, noting that his "efforts have consistently fallen short of both the department's and the college's standards" and that "two of his three reviewers did not endorse his tenure bid." Vice President (and interim Provost) Love advised Monroe in March 2013 that she had decided not to grant him tenure.

Monroe appealed the denial of tenure to Columbia's incoming President, Kwang-Wu Kim. On August 12, 2013, Kim rejected the appeal and affirmed Love's decision as Provost to deny him tenure. Monroe concluded his terminal year of employment in May 2014.

In September 2013, about one month after Kim's decision, Monroe filed a discrimination charge with the Chicago Commission on Human Relations. Monroe eventually filed a Title VII charge of race discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") on February 7, 2014, but this was more than 300 days after Love denied his application for tenure. The EEOC accepted and investigated Monroe's charge and eventually issued a right-to-sue letter on May 12, 2017, without reaching a conclusion as to the merits (or the timeliness) of his charge.

Monroe filed this suit in August 2017 after the EEOC issued his right-to-sue letter. Counts I and II of his amended complaint set forth claims of race discrimination and retaliation in violation of Title VII. Counts III and IV set forth similar claims of race discrimination in violation of 42 U.S.C. § 1981 (right to make and enforce contracts) and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d (proscribing discrimination in federally funded programs). Counts V and VI set forth state-law claims for intentional interference with contract and tortious interference with a prospective economic advantage. R. 50.

The district court dismissed Counts I through III as untimely. At the outset, the court agreed with Columbia that Provost Love's tenure decision in March 2013 was the

operative, final employment action for purposes of determining when the 300-day limitations period for Title VII claims began to run. President Kim's August 2013 decision simply amounted to appellate review of that otherwise final decision. Because Monroe did not file his EEOC charge until February 2014, some 326 days after Love's tenure decision, Counts I and II were untimely filed. *Monroe v. Columbia Coll. of Chicago*, 2018 WL 1726426, at *2–4 (N.D. Ill. April 10, 2018) (applying *Delaware State Coll. v. Ricks*, 449 U.S. 250, 260–61, 101 S. Ct. 498, 505–06 (1980)). *See Lever v. Northwestern Univ.*, 979 F.2d 552, 554–56 (7th Cir. 1992).

Although Monroe argued that certain discriminatory conduct against him continued beyond Love's tenure decision through May 2014, when his terminal year of employment at Columbia concluded, the court reasoned that none of the conduct identified constituted an adverse employment action with tangible consequences. *Monroe v. Columbia Coll. of Chicago*, 2018 WL 4074190, at *3–4 (N.D. Ill. Aug. 27, 2018).

Monroe also alleged that he was subject to a hostile working environment that continued through his final year, but the district court was not convinced that the conduct he identified as harassing rose to the level of a hostile environment. *Id.*, at *5.

Finally, Monroe contended that Columbia ought to be equitably estopped from challenging the timeliness of his complaint, but the court rejected this argument also. The court noted that equitable estoppel requires some sort of deliberate, deceptive conduct on the part of the defendant that caused the untimeliness. Apart from his own decision to originally file his discrimination charge in the wrong forum (with which Columbia had nothing to do), Monroe alleged only that Columbia had "lulled" him into thinking that it was the President rather than the Provost who was the final decisionmaker for limitations purposes. But simply because Columbia had multiple levels of review, including appellate review at the President's level, and Monroe had succeeded previously in securing a reversal of the Provost's decision, was not sufficient to show any deliberate, wrongful action on Columbia's part. *Id.*, at *5–6.

The court went on to find that Monroe's section 1981 claim (Count III) was likewise untimely. That claim is subject to a four-year statute of limitations. Monroe was denied tenure by the Provost in March 2013, but he did not file his federal complaint until August 2017, more than four years later. *Id.*, at *6.

The court subsequently entered summary judgment in Columbia's favor as to Counts IV through VI. *Monroe v. Columbia Coll. Chicago*, 2020 WL 1503593 (N.D. Ill. Mar. 30, 2020). (The judgment as to Count IV, asserting the Title VI claim for race-based exclusion from participation in a federally-funded program, is addressed in our separate opinion.) Count V is a claim for intentional interference with contract under Illinois law. The gist of the claim is that Sheridan, by submitting factually false reports

as to Monroe's performance, effectively caused Columbia to breach its contract with Monroe by denying him tenure notwithstanding the fact that he met the College's criteria for tenured employment and was "entitled" to tenure. R. 50 at 24. Judge Durkin assumed that the published tenure criteria constituted a contract, but he emphasized that Columbia, as opposed to Sheridan, had done nothing to breach that contract. *Id.*, at *5. Finally, Count VI asserts a claim for tortious interference with a prospective economic advantage. Monroe alleges that Sheridan, by misrepresenting his performance, effectively doomed his tenure application. But Judge Durkin noted that the first element of such a claim is a reasonable expectation of entering into a business relationship, which in this case would be a grant of tenure and a renewal of his teaching contract. Yet Columbia's tenure criteria make clear that there is no right to tenure and that tenure is granted only to the most highly-qualified individuals. Monroe "d[id] not cite a single case" in which a candidate could say that he had a reasonable expectation of being granted tenure. Moreover, from his first year onward, there were criticisms of Monroe's performance. So while Monroe may have hoped that he would be granted tenure, he could not reasonably claim to have expected it. *Id.*, at *6.

## II.

A.      *Timeliness of Counts I and II: discriminatory acts in Monroe's terminal year.*

The Title VII claims of race discrimination and retaliation set forth in Counts I and II of Monroe's complaint are subject in practice to a 300-day limitations period in Illinois, in view of the EEOC's work-sharing arrangement with the Illinois Department of Human Rights. *See* 42 U.S.C. § 2000e-5(e)(1); *Mirza v. Neiman Marcus Grp., Inc.*, 649 F. Supp. 2d 837, 849–52 (N.D. Ill. 2009). As noted, Monroe did not file his Title VII charge with the EEOC until more than 300 days after the Provost's March 2013 decision to deny him tenure.[1]

Although the denial of tenure takes center stage in Monroe's complaint, he alleges that the College took other, related adverse employment actions against him through the end of his terminal year in May 2014 and contends that because these actions took place within the limitations period, his complaint is timely. These include such things as not allowing him to teach advanced courses, denying him a position as a project coordinator, preventing him from interacting with community groups,

---

[1] Monroe's prior filing with the Chicago Commission on Human Relations is of no benefit to him in this respect because the Commission has no work-sharing relationship with the EEOC. *See* 29 C.F.R. § 1601.74(a); *Crawford v. Bank of Am.*, 986 F. Supp. 506, 509 (N.D. Ill. 1997); *Osborn v. E.J. Brach, Inc.*, 864 F. Supp 56, 58 n.4 (N.D. Ill. 1994).

denigrating his work to others, and disallowing his participation in inter-disciplinary teaching. In Monroe's view, such acts, taken together, could be thought to have dimmed his future career employment prospects and denied him additional income. *See Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002).

We agree with the district court that these additional allegations are insufficient to establish a distinct, material adverse action that might render Counts I and II timely. Among the various actions alleged, the one that would have had the most obvious potential to affect Monroe's employment prospects elsewhere was denying him the opportunity to teach more advanced courses. But Monroe has alleged in his amended complaint that he *did* in fact teach advanced courses in his terminal year. R. 50 ¶ 50. As for the remaining actions, Monroe has not made a plausible case for why these were significant enough to result in concrete harm to his career prospects and constitute an adverse employment action on their own.

B.      *Timeliness of Counts I and II: hostile work environment.*

Monroe alternatively argues that he was subject to a hostile working environment which continued through his terminal year. Assuming that there were underlying acts of harassment that took place in Monroe's final year at Columbia, then one or both of his Title VII claims might be timely to the extent they seek relief for a hostile environment. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118, 125 S. Ct. 2061, 2075 (2002). However, the harassment underlying a hostile environment claim must qualify as severe or pervasive in order to be actionable. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22, 114 S. Ct. 367, 370–71 (1993), *abrogated on other grounds, Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257 (1998). Among the pertinent negative actions briefly referenced in the complaint (e.g., Sheridan accusing Monroe of "playing the race card" and engaging in "hyper-surveillance" of his activities) and flagged in the briefing, none qualify as severe, and neither do the allegations plausibly describe a workplace that was permeated with offensive and demeaning conduct over a significant period of time. *See id.* at 21, 114 S. Ct. at 370; *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002).

C.      *Timeliness of Counts I, II, III, and VI: equitable estoppel.*

Monroe also asserts that equitable estoppel ought to preclude Columbia from arguing that his Title VII, section 1981, and his Title VI claims are untimely. He makes two points in this regard. First, citing a Third Circuit case, *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1390 (3d Cir. 1994), *overruled in part on other grounds by Rotkiske v. Klemm*, 890 F.3d 422, 428 (3d Cir. 2018) (en banc), *j. aff'd*, 140 S. Ct. 355 (2019), Monroe argues that mistakenly filing a complaint in the wrong forum can be a basis for

equitable relief. *Oshiver*'s conception of when equitable relief is appropriate is broader than the one this court has adopted, *see Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 267–68 (7th Cir. 1995), but Monroe appears to rely on *Oshiver*'s discussion of a plaintiff's diligence, and the importance of that diligence in awarding equitable relief, for the notion that his own timely pursuit of relief, albeit initially in the wrong forum (the Chicago Commission on Human Relations), paves the way for him to invoke the doctrine of equitable estoppel and to argue that Columbia's wrongdoing should support the application of that doctrine and excuse the tardy filing of his EEOC charge. Reply Br. at 6–7. Monroe thus goes on to argue that Columbia made statements to the EEOC indicating, contrary to its argument now, that the Provost's March 2013 tenure decision was merely a *recommendation*, and that it was President Kim who made the final tenure decision in August 2013. *See* R. 55-1 at 6, 8. These statements purportedly misled Monroe into believing that the statute of limitations on his discrimination claims did not begin to run until August 2013, when Kim affirmed the Provost's decision. *Compare Williamson v. Indiana Univ.*, 345 F.3d 459, 463 (7th Cir. 2003) (rejecting plaintiff's invocation of equitable estoppel in the absence of evidence that either EEOC or defendant took active steps to prevent plaintiff from timely filing claim), *with Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450–51 (7th Cir. 1990) (indicating equitable estoppel would be appropriate when defendant has promised not to plead statute of limitations).

Monroe's equitable estoppel theory goes nowhere. First, with respect to the Title VII claims set forth in Counts I and II, Columbia made these statements to the EEOC in April 2014, *after* Monroe had already filed his EEOC charge late, so these statements cannot be said to have "prevented" Monroe from timely pursuing his EEOC charge. Equitable estoppel thus cannot rescue Counts I and II.

Second, as to Counts III (section 1981) and IV (Title VI) Monroe contends that had he realized it was the Provost's decision that started the limitations clock, he would have more timely filed his federal complaint; instead, Columbia's statements to the EEOC led him to believe the clock did not begin to run until August 2013. He adds that neither Columbia nor the EEOC raised any questions as to the timeliness of his claims during the years his charge was pending with the agency. But, as Judge Durkin emphasized, equitable estoppel requires a deliberate strategy on the part of the defendant. We see nothing in the record that supports an inference that Columbia was deliberately trying to deceive or lull Monroe on this point so that he would fail to timely pursue legal relief on his claims, or even that the College clearly understood that its actions would cause Monroe to delay taking action in pursuit of his claims. *See Hedrich v. Bd. of Regents of Univ. of Wis. Sys.*, 274 F.3d 1174, 1182 (7th Cir. 2001). It is not unusual

for lawyers to overlook points or to advance new arguments as a case proceeds, after all.

D.    *Count V: intentional interference with contract.*

Monroe's state-law claim for interference with contract against Sheridan posits that Sheridan caused Columbia to breach its contractual agreement to base its tenure decision on its published criteria for tenure when it relied on Sheridan's evaluations of his performance rather than those criteria, without recognizing that Sheridan had placed limitations on Monroe's ability to meet these criteria and had misrepresented Monroe's performance as a teacher. But, as the district court reasoned, there is no evidence that Columbia abandoned its stated criteria for tenure. Rather, it was influenced by Sheridan's reports (as one might expect, given his position as Monroe's department chairperson) in applying those criteria. Whatever wrongdoing Monroe attributes to Sheridan, the result was not a breach of contract by Columbia.

E.    *Count VI: tortious interference with prospective economic advantage.*

Count VI alleges that Sheridan, by submitting his unfounded negative evaluation of Monroe, tortiously interfered with Monroe's tenure application (and, in turn, his future employment prospects). This claim arguably is a better fit for what Monroe is alleging, *i.e.*, that Monroe was qualified and expected to be given tenure but Sheridan deliberately interfered with the process and sank his tenure application. But this claim, as the district court noted, requires as its first element a reasonable expectation of entering into a business relationship. *Foster v. Principal Life Ins. Co.*, 806 F.3d 967, 971 (7th Cir. 2015) (quoting *Voyles v. Sandia Mortg. Co.*, 751 N.E.2d 1126, 1133 (Ill. 2001)). Tenure is a highly discretionary decision and is frequently denied to any number of competent candidates whom a university deems not to meet its criteria. Nothing in Columbia's published tenure criteria or in its dealings with Monroe promised or guaranteed him tenure, whatever his unilateral hopes may have been. Moreover, although he received the favorable (albeit divided) vote of the faculty members in his department, and there appears to have been a consensus that his teaching and teaching-related performance had substantially improved over the course of his time at Columbia, there were certain persistent criticisms of Monroe in that respect throughout his time there. So it is just not plausible to say that he had a reasonable expectation of being granted tenure. *See Goswami v. DePaul Univ.*, 2014 WL 125600, at *5–7 (N.D. Ill. Jan. 14, 2014) (Illinois law) (noting, *inter alia*, that glowing reviews did not give rise to a reasonable expectation of tenure and contract renewal); *Montes v. Cicero Pub. Sch. Dist. No. 99*, 141 F. Supp. 3d 885, 900–01 (N.D. Ill. 2015) (Illinois law) (non-renewal of year-to-year teaching contract). This claim fails also.

**III.**

For all of the foregoing reasons, we AFFIRM the district court's judgment as to Counts I through III and V and VI of Monroe's amended complaint.