[No. C065100. Third Dist. June 26, 2012.]

OUTFITTER PROPERTIES, LLC, et al., Plaintiffs and Appellants, v. WILDLIFE CONSERVATION BOARD et al., Defendants and Respondents; DEPARTMENT OF FISH AND GAME, Real Party in Interest and Respondent.

240

## COUNSEL

Minasian, Spruance, Meith, Soares & Sexton, Minasian, Meith, Soares, Sexton & Cooper, Paul R. Minasian and Dustin C. Cooper for Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, Kathleen A. Kenealy, Assistant Attorney General, Sara J. Russell and Deborah L. Barnes, Deputy Attorneys General, for Defendants and Respondents and for Real Party in Interest and Respondent.

## OPINION

MAURO, J.—The Wildlife Conservation Board (Board) paid $9.98 million from the Habitat Conservation Fund to the federal Bureau of Reclamation for the Battle Creek Salmon and Steelhead Restoration Project. Outfitter Properties, LLC, and Rocky Springs Ranch, LLC (collectively Outfitter), subsequently filed a petition for writ of mandate seeking to vacate the Board's expenditure decision. The trial court denied the petition.

Outfitter contends on appeal that (1) Fish and Game Code section 2791, subdivision (d) (section 2791(d))[1] limits expenditures from the Habitat Conservation Fund to no more than $6 million over any 24-month period; (2) the Board expenditure violated the $2 million annual limit on allocations to state agencies set forth in section 2791, subdivision (f) (section 2791(f)); (3) the Legislature cannot amend the $6 million and $2 million limits without the approval of four-fifths of the members of both houses of the Legislature; and (4) the trial court erred in considering documents that were not considered by the Board in making its expenditure decision.

We conclude (1) section 2791(d) does not establish a $6 million expenditure limit but instead gives the Board limited discretion to make expenditures; (2) the Board expenditure did not violate the $2 million limit on allocations to state agencies because the expenditure was paid to the federal Bureau of Reclamation; (3) the 2005 Budget Act did not amend section 2791(d) or

---

[1] Undesignated statutory references are to the Fish and Game Code.

section 2791(f); and (4) the extra-record evidence was admissible to assist the trial court in deciding Outfitter's challenge to the expenditure.

We will affirm the judgment.

## BACKGROUND

California salmon and trout populations have declined in recent decades partly because water projects have blocked anadromous[2] fish access to natal streams. Chinook salmon and steelhead trout have been listed as threatened or endangered species.

Battle Creek, a tributary of the Sacramento River located in Tehama and Shasta Counties, is an important habitat for anadromous salmon and trout because of its geology and hydrology. Outfitter owns real property adjoining portions of the south fork of Battle Creek in Tehama County. Pacific Gas and Electric Company (PG&E) owns and operates the Battle Creek Hydroelectric Project, which includes diversion facilities on the north and south forks of Battle Creek.

Recognizing the unique characteristics of Battle Creek and its importance to the restoration of salmon and trout populations in the Sacramento River, the National Marine Fisheries Service, federal Bureau of Reclamation, U.S. Fish and Wildlife Service, California's Department of Fish and Game (Fish and Game) and PG&E signed a memorandum of understanding in 1999 (the 1999 MOU) for the Battle Creek Salmon and Steelhead Restoration Project (the Restoration). The Restoration would modify PG&E's Battle Creek hydroelectric operation by, among other things, installing fish screens and fish ladders, decommissioning certain dams, and installing connections and water conveyance facilities. The proposed changes aimed to improve fish passage on Battle Creek while minimizing the loss of energy production.

The parties to the 1999 MOU anticipated the Restoration would cost about $50.7 million, of which approximately $27.1 million would be provided by a federal grant. The federal Bureau of Reclamation would be the lead agency for construction and would authorize disbursements of federal funds for the Restoration. Fish and Game was not responsible for funding any component of the Restoration.

In 2007, however, Fish and Game applied to the Board for a $9.98 million grant from the Habitat Conservation Fund (Fund) because increased costs

---

[2] "Anadromous" refers to fish species that spend a portion of their lives in the ocean but return to fresh water to reproduce. (§ 14.)

necessitated additional funds to complete the Restoration.[3] The grant would provide a portion of the necessary funding for a partnership project involving various public agencies and private entities, including the entities that signed the 1999 MOU, for the purpose of restoring salmon and trout habitat along 42 miles of Battle Creek and an additional six miles of tributaries in Tehama and Shasta Counties (the Partnership Project). The Partnership Project evolved from the Restoration described in the 1999 MOU.

On August 23, 2007, the Board approved the requested grant and subsequently paid $9.98 million from the Fund to the federal Bureau of Reclamation for the Partnership Project. The money had been collected under the Water Security, Clean Drinking Water, Coastal and Beach Protection Act of 2002 (Wat. Code, § 79500 et seq.), also known as Proposition 50.[4]

Outfitter filed a petition for writ of mandate seeking to vacate the Board's expenditure decision.[5] The petition was asserted against the Board, the State of California, and John P. Donnelly, executive director of the Board. Fish and Game was named as a real party in interest. The trial court denied the writ petition.

## STANDARD OF REVIEW

" 'In reviewing a trial court's judgment on a petition for writ of ordinary mandate, the appellate court applies the substantial evidence test to the trial court's factual findings, but exercises its independent judgment on legal issues, such as the interpretation of statutes. [Citation.]' [Citation.] Thus, to the extent that the trial court's decision does not turn on disputed facts, we review de novo the trial court's interpretation of the [statutory] . . . provisions

---

[3] The Board is a statutorily created entity within Fish and Game. (§ 1320.) The Board's purpose includes the study and determination of areas within the state that are essential and suitable for wildlife preservation. (§ 1345.) The Board can award grants "to nonprofit organizations, local governmental agencies, federal agencies, and state agencies for the purposes of fish and wildlife habitat restoration, [and] enhancement . . . ." (§ 1350, subd. (c).)

[4] The Water Security, Clean Drinking Water, Coastal and Beach Protection Act of 2002 set aside $180 million from bond funds for the implementation of the CALFED Bay-Delta Program, an ecosystem restoration program relating to the San Francisco Bay/Sacramento-San Joaquin Delta estuary. (Wat. Code, §§ 79505, subd. (d), 79510, 79550, subd. (e), 79580.) The Partnership Project was developed in the context of the CALFED Bay-Delta Program.

[5] Outfitter also filed two other writ petitions which challenged the Partnership Project based on the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) and Proposition 50. Those petitions are the subject of a separate appeal (*Outfitter Properties v. State Water Resources Control Bd.* (Mar. 15, 2012, C064470) [nonpub. opn.]). The Board requests that we take judicial notice of case No. C064470 for a "full description" of the Partnership Project. We deny the request because the Board does not specify the portions of the record in case No. C064470 relevant to the issues before us. (Cal. Rules of Court, rule 3.1306(c)(1); *Gbur v. Cohen* (1979) 93 Cal.App.3d 296, 301 [155 Cal.Rptr. 507].)

at issue. [Citations.]" (*Committee for Responsible School Expansion v. Hermosa Beach City School Dist.* (2006) 142 Cal.App.4th 1178, 1184 [48 Cal.Rptr.3d 705].)

The Board's exercise of its discretion to allocate money in the Fund to a particular project is not subject to judicial review unless the decision was arbitrary, capricious or entirely lacking in evidentiary support. (*Pac. Inter-Club Yacht Assn. v. Richards* (1961) 192 Cal.App.2d 616, 623 [13 Cal.Rptr. 730]; *Sacks v. City of Oakland* (2010) 190 Cal.App.4th 1070, 1081–1082 [120 Cal.Rptr.3d 1].) We presume that official duty has been regularly performed and that the Board has complied with the law. (*Wilson v. Ostly* (1959) 173 Cal.App.2d 78, 86 [343 P.2d 349]; Evid. Code, § 664; Civ. Code, § 3548.) Outfitter bears the burden of proving that the Board acted improperly. (*Khan v. Los Angeles City Employees' Retirement System* (2010) 187 Cal.App.4th 98, 106 [113 Cal.Rptr.3d 417].)

■ Outfitter's contentions require us to interpret the applicable statutes. In interpreting statutory language adopted by voter initiative, our primary task is to determine the intent of the electorate so that we may adopt the construction that best effectuates the purpose of the law. (*Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 45 [105 Cal.Rptr.3d 181, 224 P.3d 920]; *Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 900–901 [135 Cal.Rptr.2d 30, 69 P.3d 951].) We begin with the statutory language because it is generally the most reliable indicator of legislative intent. (*Committee for Green Foothills v. Santa Clara County Bd. of Supervisors, supra*, 48 Cal.4th at p. 45.) If there is no ambiguity in the language of a statute, we construe the words according to their ordinary meaning without reference to other indicia of the voters' intent. (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798–800 [268 Cal.Rptr. 753, 789 P.2d 934].) We use the ordinary dictionary meaning of terms when terms are not defined in the statute. (3B Singer & Singer, Sutherland Statutory Construction (2011 new ed.) Conservation and Environmental Legislation, § 77:1, p. 250.) We also construe the words in context, keeping in mind the statutory purpose, and harmonize statutes or statutory sections relating to the same subject, both internally and with each other, to the extent possible. (*Robert L. v. Superior Court, supra*, 30 Cal.4th at pp. 901, 903; *Los Angeles Unified School Dist. v. County of Los Angeles* (2010) 181 Cal.App.4th 414, 423 [104 Cal.Rptr.3d 590].) A construction making some words surplusage is to be avoided. (*Delaney v. Superior Court, supra*, 50 Cal.3d at pp. 798–799.)

■ When statutory language is susceptible of more than one reasonable interpretation, we refer to other indicia of the voters' intent, particularly the analyses and arguments contained in the official ballot pamphlet. (*Committee for Green Foothills v. Santa Clara County Bd. of Supervisors, supra*, 48

Cal.4th at p. 45; *Robert L. v. Superior Court, supra*, 30 Cal.4th at p. 901.) " 'Where uncertainty exists consideration should [also] be given to the consequences that will flow from a particular interpretation. [Citation.]' " (*Coastside Fishing Club v. California Resources Agency* (2008) 158 Cal.App.4th 1183, 1195 [71 Cal.Rptr.3d 87].) Further, we are mindful that laws providing for the conservation of natural resources are to be given a liberal construction. (*Blumenfeld v. San Francisco Bay Conservation etc. Com.* (1974) 43 Cal.App.3d 50, 56 [117 Cal.Rptr. 327].)

## DISCUSSION

## I

Outfitter contends that section 2791(d) limits expenditures from the Fund to no more than $6 million over any 24-month period for projects relating to the acquisition, restoration or enhancement of riparian habitat and aquatic habitat for the spawning and rearing of anadromous salmonids and trout.

■ Section 2791(d) is part of the California Wildlife Protection Act of 1990 (the Act) (§ 2780 et seq.). California voters passed the Act as Proposition 117 on June 5, 1990. The Act declares that the "[p]rotection, enhancement, and restoration of wildlife habitat and fisheries are vital to maintaining the quality of life in California" and all state officials shall implement the Act "to the fullest extent of their authority in order to preserve, maintain, and enhance California's diverse wildlife heritage and the habitats upon which it depends." (§ 2780, subds. (a) & (e); see § 2781.) The Act must be liberally construed to further its purposes. (Ballot Pamphlet, Primary Elec. (June 5, 1990) text of Prop. 117, p. 76.)

■ The voters intended to make additional needed funds available to protect fish, wildlife and native plant resources, and for the Legislature to provide those funds through bond acts and other appropriate sources. (§ 2781.) To that end, Proposition 117 created the Fund and, effective July 1, 1990, requires the State Controller to transfer $30 million annually to the Fund from the General Fund and existing environmental funds, such as the Water Security, Clean Drinking Water, Coastal and Beach Protection Fund of 2002 (Wat. Code, § 79510), for the next 30 years to be used to acquire, enhance or restore specified types of land for wildlife or open space. (§§ 2786, 2795, 2796; Ballot Pamphlet, Primary Elec. (June 5, 1990) analysis of Prop. 117 by Legis. Analyst, p. 40.) Money in the Fund is appropriated annually as follows: (a) $4.5 million to the Department of Parks and Recreation for specified projects or purposes, (b) $4 million to the State Coastal Conservancy, (c) $5 million to the Santa Monica Mountains Conservancy for the 10 fiscal years

commencing with the 1990–1991 fiscal year for specified purposes, (d) $500,000 to the California Tahoe Conservancy, and (e) the balance of the Fund to the Board. (§ 2787.)

■ Section 2786 lists the purposes for which money in the Fund may be expended, including the restoration of aquatic habitat for the spawning and rearing of salmon and trout resources. (§ 2786, subd. (e).) In this case, the funds were allocated for that purpose.

Section 2791(d) provides, "Notwithstanding the requirement for acquisition in subdivisions (a), (b), and (c) of Section 2786,[6] the [B]oard shall, to the extent practicable, expend the money in the [F]und in a manner and for projects so that, within each 24-month period, approximately six million dollars ($6,000,000) of the money, including, until July 1, 2020, the expenditures by the agencies receiving money from the [F]und pursuant to subdivisions (a) to (d), inclusive, of Section 2787,[7] are expended for the purposes specified in subdivision (e) and (f) of Section 2786."

■ Outfitter argues the voters intended $6 million to be the maximum amount that may be expended in a 24-month period for the restoration of anadromous salmon and trout habitat. But section 2791(d) authorizes the expenditure of *approximately* $6 million. (§ 2791, subd. (d).) " 'Approximately' means about or nearly; it is the opposite of precisely or exactly." (*Hoffman v. McNamara* (1929) 102 Cal.App. 280, 285 [282 P. 990] [interpreting former § 131 of the Motor Vehicle Act]; see Black's Law Dict. (6th ed. 1990) p. 103 ["approximately" means very nearly but not absolutely].) In contrast with the use of the word "approximately" in section 2791(d), the voters used the phrase "not more than" in section 2791, subdivision (a) and section 2791(f) to convey a ceiling for other categories of expenditure. This indicates the word "approximately" was not intended to impose an expenditure ceiling. (*People v. Murphy* (2001) 25 Cal.4th 136, 159 [105 Cal.Rptr.2d 387, 19 P.3d 1129] ■ [use of different language suggests a different legislative intent]; *Faulder v. Mendocino County Bd. of Supervisors* (2006) 144 Cal.App.4th 1362, 1372 [51 Cal.Rptr.3d 251] [" 'When the Legislature uses materially different language in statutory provisions addressing the same subject or related subjects, the normal inference is that the Legislature intended a difference in meaning.' "].)

---

[6] Section 2786, subdivisions (a), (b) and (c) provide that, except in a circumstance inapplicable to this case, the money in the Fund shall be used for the acquisition of habitat (a) necessary to protect deer and mountain lions, (b) to protect rare, endangered, threatened, or fully protected species, and (c) to further implement the Habitat Conservation Program (with certain specified exceptions).

[7] Section 2787, subdivisions (a) through (d) specify the amounts to be allocated from the Fund annually to the Department of Parks and Recreation, State Coastal Conservancy, Santa Monica Mountains Conservancy and California Tahoe Conservancy.

■ Section 2791(d) authorizes the Board to expend money from the Fund "to the extent practicable." Some courts have said that "practicable" in a government context means that an entity is vested with discretion to consider the "advisability" of an action, and have explained that "practicable" does not mean "possible." (*Covarrubias v. Superior Court* (1998) 60 Cal.App.4th 1168, 1183–1184 [71 Cal.Rptr.2d 91] (*Covarrubias*); *Wilson v. Ostly, supra*, 173 Cal.App.2d at p. 85.) Section 2791(d) thus authorizes the Board, when it considers it advisable, to expend within each 24-month period about $6 million of the money in the Fund for the purposes specified in section 2786, subdivisions (e) and (f).

Outfitter also points to the argument in favor of Proposition 117 in the June 5, 1990 official ballot pamphlet as an indication of voter intent. The ballot argument states that Proposition 117 "will also BENEFIT FISHING. Approximately $3 million per year will go to improve our trout and salmon streams." (Ballot Pamphlet, Primary Elec. (June 5, 1990) argument in favor of Prop. 117, p. 42.) Outfitter says the reference to approximately $3 million per year evidences voter intent to cap expenditures at $6 million.

It is not necessary to consider the ballot argument, however, because the language of the statute is not ambiguous on this issue. When section 2791(d) uses the words "approximately six million dollars," that clearly does not mean "no more than six million dollars." In any event, the ballot argument also uses the word "approximately."

Outfitter further argues that the Board's staff interpreted section 2791(d) as imposing a $6 million expenditure cap. Page 30 of the administrative record purports to be an analysis of the Act prepared by Board staff. The analysis says section 2791(d) provides that "up to" $6 million shall be spent every two years for the acquisition, enhancement or restoration of aquatic habitat for spawning and rearing anadromous salmon and trout and riparian habitat. Outfitter asserts that this interpretation by the Board's staff is entitled to consideration and respect by the courts.

We decline to adopt the staff interpretation, however, because it is inconsistent with the language of the statute. As we have explained, the words "approximately six million dollars" in section 2791(d) do not mean "up to six million dollars." In fact, the purported staff analysis notes that it was prepared without legal advice and "may be subject to further legal clarification." Moreover, even if the statutory language was ambiguous, the staff analysis could not assist us in determining voter intent because there is no evidence it

was ever presented to the voters in 1990. (*Delaney v. Superior Court, supra,* 50 Cal.3d at p. 801.) There is also no evidence that the Board adopted the staff interpretation.

■ We thus reject Outfitter's contention that section 2791(d) imposes a strict $6 million expenditure limit. We conclude instead that the Board has limited discretion to expend money from the Fund under section 2791(d).[8] (See, e.g., *Covarrubias, supra,* 60 Cal.App.4th at p. 1180 [the juxtaposition of the phrase "where practicable" with the word "shall" in Code Civ. Proc., § 223 evinces an intent to vest discretion to determine the practicability of a course of action]; *Wilson v. Ostly, supra,* 173 Cal.App.2d at pp. 83–84 [provision in county charter that promotional examinations shall be held when practicable gave defendants limited discretion].) The statute sets a biennial goal and does not mandate a maximum or a minimum. Although we recognize that $9.98 million is not $6 million, Outfitter did not raise or brief how we would determine the outer boundary of the Board's limited discretion if we rejected its claim of a strict $6 million expenditure limit. Accordingly, the outer boundary of the Board's discretion under section 2791(d) is not before us in this case and we express no opinion on that issue. In addition, the suggestion by Outfitter that the $9.98 million expenditure took money away from other worthy environmental projects is not accompanied by citation to the record and is thus forfeited. (*Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856 [85 Cal.Rptr.2d 521].)

Outfitter ultimately agrees that the Board has limited discretion to expend money from the Fund, but it argues that the phrase "to the extent practicable" in section 2791(d) imposed a threshold requirement to determine why it would be impracticable to expend only $6 million for the Partnership Project. Outfitter relies on *People v. Vieira* (2005) 35 Cal.4th 264, 288 [25 Cal.Rptr.3d 337, 106 P.3d 990] (*Vieira*), a case that cited *Covarrubias, supra,* 60 Cal.App.4th 1168, 1184.

---

[8] The Board's discretion enables it to meet the funding requirements in section 2787 and the spending targets in section 2791, subdivisions (b) through (e) when determining which land acquisition and habitat protection projects should be funded and comports with the goal in Proposition 117 to protect, enhance, and restore rapidly disappearing wildlife habitat "in the most expeditious manner." (§ 2780, subd. (e); see §§ 2780, subd. (a), 2781, 2797; Ballot Pamphlet, Primary Elec. (June 5, 1990) argument in favor of Prop. 117, p. 42.) Such discretion is also consistent with the statement in the ballot pamphlet that funds from Proposition 117 will be spent under the supervision of public agencies such as the Board and the Board's authority to investigate and determine what areas within the state are most suitable for wildlife preservation. (§ 1345.)

In *Vieira*, the California Supreme Court noted that Code of Civil Procedure section 223 " 'vests the trial court with discretion to determine the advisability or practicability of conducting voir dire in the presence of the other jurors' " and that a "trial court that altogether fails to exercise its discretion to determine the practicability of group voir dire has not complied with its statutory obligation." (*Vieira, supra*, 35 Cal.4th at p. 288.) Nonetheless, the Supreme Court concluded that the defendant forfeited the claim that group voir dire was not "practicable" in his case because he did not timely raise the issue and, even if the claim could have been considered on appeal, the defendant did not show that group voir dire was impracticable because there was no evidence of actual bias by the prospective jurors. (*Id.* at pp. 288–289.) The *Vieira* court did not discuss whether the trial court in that case exercised its discretion to determine whether group voir dire was "practicable."

In *Covarrubias, supra*, 60 Cal.App.4th 1168, the appellate court concluded, based on the record, that the trial court failed to exercise its discretion to inquire into the practicability of group voir dire. (*Covarrubias, supra*, 60 Cal.App.4th at pp. 1182–1183.)

 *Vieira* and *Covarrubias* stand for the proposition that discretion should be exercised. They do not require the Board to make a threshold determination regarding the practicability of placing a cap on that discretion.

 Here, the record permits an inference that the Board exercised its discretion, and Outfitter has not established the contrary. (*Wilson v. Ostly, supra*, 173 Cal.App.2d at pp. 81, 84–86 [trial court reasonably concluded from the record that county civil service commission complied with county charter requirement for promotion examination " '[w]henever practicable' " even though the commission's minutes did not contain an express statement that a promotional examination was not practicable].) The agenda for the August 23, 2007 Board meeting described why the Partnership Project was an "exceptional" and "unique" conservation opportunity "to reestablish 42 miles of prime and uniquely reliable salmon and steelhead habitat," and stated that the "[s]uccessful implementation of this project will help restore populations of winter-run Chinook salmon, spring run Chinook salmon and steelhead, all of which are in danger or threatened with extinction." The agenda informed the Board about the funding already obtained for the Partnership Project, how much more was needed to complete the Partnership Project, and that $9.98 million would provide a portion of necessary project funding. The agenda also informed the Board about the various agencies and entities involved in the Partnership Project, that a joint environmental impact report had already been prepared to comply with the California Environmental Quality Act, and that the Partnership Project was consistent with the uses allowed under the funding source, Proposition 50. Fish and Game informed the Board that $10

million was necessary to complete the Partnership Project and said it was "imperative" that the $10 million be transferred as soon as possible to enable the federal Bureau of Reclamation to release bid packages to secure construction contractors for work to begin in fall 2007. The agenda further informed the Board that its staff recommended allocating the requested $9.98 million from the Fund to the Partnership Project. The August 23, 2007 meeting minutes do not reflect any opposition to the Partnership Project proposal. Consistent with staff recommendation, the Board approved the requested allocation of $9.98 million to the Partnership Project.

Outfitter's interpretation of section 2791(d) lacks merit.

## II

Outfitter also contends the Board expenditure violated the $2 million annual limit on allocations to state agencies set forth in section 2791(f). Section 2791(f) provides, "Subject to the other requirements of this section, the [B]oard may allocate not more than two million dollars ($2,000,000) annually for the purposes of this chapter to one or more State agencies created by the Legislature or the people which are authorized by other provisions of law to expend funds for the purposes of this chapter."

Section 2791(f) establishes a limit on allocations to state agencies. But the Board expenditure in this case did not violate section 2791(d) because the expenditure was paid to the federal Bureau of Reclamation and not to a state agency. Outfitter's contention fails.

## III

Outfitter next asserts that the Legislature cannot amend the $6 million and $2 million limits without the approval of four-fifths of the members of both houses of the Legislature. The contention is based on an argument in the trial court that the Board must "harmonize" the Act with the provisions of the 2005 Budget Act (Stats. 2005, ch. 38, § 2.00, item No. 3640-301-0262, pp. 523, 711).

To resolve this contention, it is sufficient to note that the 2005 Budget Act did not amend section 2791(d) or section 2791(f). Our decision does not require us to harmonize different enactments; it merely requires us to interpret the plain meaning of section 2791(d) and section 2791(f). As we have explained, Outfitter fails to show that the Board's August 23, 2007 decision violated section 2791(d) and section 2791(f).

## IV

Outfitter claims the trial court erred in admitting documents that were not considered by the Board in making its expenditure decision. The documents were created after the Board approved the expenditure and show that the money allocated on August 23, 2007, was actually paid to the federal Bureau of Reclamation, not to Fish and Game. Outfitter argues that with exceptions not applicable here, such extra-record documents—in this case, documents not considered by the Board but considered by the trial court and included in the record on appeal—are not admissible in a "traditional" mandamus action. Outfitter asserts that when the extra-record evidence is excluded, the only supportable conclusion from the record is that the payment was made to Fish and Game.

 Outfitter and the Board agree that this case is a traditional mandamus action under Code of Civil Procedure section 1085 rather than an administrative mandamus action under Code of Civil Procedure section 1094.5. They also agree there are exceptions to the general rule precluding the consideration of extra-record evidence in traditional mandamus actions. Although extra-record evidence is not admissible to contradict evidence upon which the administrative agency relied in making its quasi-legislative decision, or to raise a question regarding the wisdom of that decision (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 579 [38 Cal.Rptr.2d 139, 888 P.2d 1268] (*Western States*)), it may be admissible to provide background information regarding the quasi-legislative agency decision, to establish whether the agency fulfilled its duties in making the decision, or to assist the trial court in understanding the agency's decision. (*Western States, supra,* 9 Cal.4th at pp. 578–579; *Asarco, Inc. v. U.S. E.P.A.* (9th Cir. 1980) 616 F.2d 1153, 1160; *Association of Pacific Fisheries v. Environmental Protection* (9th Cir. 1980) 615 F.2d 794, 811–812.)

The extra-record evidence in this case was admissible to assist the trial court in deciding Outfitter's contention that the Board expenditure violated the $2 million annual expenditure limit in section 2791(f). The contention required the trial court to determine whether the Board allocated more than $2 million to a state agency. The extra-record evidence established that the money was paid to the federal Bureau of Reclamation. The extra-record evidence did not contradict the information considered by the Board in making its decision and did not call into question the wisdom of that decision. Accordingly, the trial court correctly recognized that *it could consider the extra-record evidence*.

## DISPOSITION

The judgment is affirmed.

Raye, P. J., and Hull, J., concurred.