Filed 9/6/13  Grisham v. Notre Dame De Namur University CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CHARLES CURTIS GRISHAM, JR.,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>NOTRE DAME DE NAMUR UNIVERSITY,<br><br>    Defendant and Respondent. | A135765<br><br>(San Mateo County<br>Super. Ct. No. CIV501683)<br><br>ORDER MODIFYING OPINION AND<br>  DENYING REHEARING<br>  [NO CHANGE IN JUDGMENT] |

THE COURT[1]:

The opinion filed August 13, 2013, is hereby modified as follows:

1. On page 4, the first two sentences of the first full paragraph shall be modified to read as follows:

    A meeting was held on April 30, 2007.  In attendance were plaintiff, his ombudsman appointed by the University, Dean Rossi, and Dr. Chang.

2. On page 4, the second full paragraph shall be modified to read as follows:

    Dean Rossi advised plaintiff that the Committee had recommended that plaintiff pursue other teaching programs at other universities or reconsider "the teaching profession."  The conclusion of the meeting became contentious when Dean Rossi indicated her belief in response to plaintiff's inquiry that he was not suited to the teaching profession, and plaintiff replied that she was not fit to be dean of the program.  Dean Rossi reported on the April 30, 2007, interaction at a meeting of the Committee held the following day.  The minutes of this meeting

---

[1]  Before Dondero, Acting P. J., Banke, J, and Sepulveda, J.* Retired Associate Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

indicate that the Committee determined plaintiff "violated university policies about misconduct," specifically section C of the "Notre Dame de Namur University Student Handbook & Academics Planner" (Student Handbook), "Non-Academic Misconduct," by verbally abusing University faculty and staff. The Committee authorized Dean Rossi to obtain written documentation of incidents of plaintiff's inappropriate conduct, and send notice to him "disqualifying him from the University" based on unprofessional behaviors.

3. On page 15, the first sentence of the last paragraph shall be modified to read as follows:
   A meeting was held on April 30, 2007, at which plaintiff appeared and was represented by his ombudsman appointed by the University.

4. On page 15, the third sentence of the last paragraph shall be modified to read as follows:
   The Committee subsequently authorized Dean Rossi to send notice to plaintiff of his disqualification from the Program based on unprofessional behavior.

5. On page 16, the second sentence of the first full paragraph shall be modified to read as follows:
   The Committee, although composed of members of the Program faculty and administrators, rendered a deliberate decision to dismiss plaintiff following careful consideration of his performance and conduct.

6. On page 16, the *Harris* citation following the newly modified second sentence of the first full paragraph shall be deleted.


Appellant's petition for rehearing is hereby denied.

There is no change in judgment.


Dated: _____          _____
                                         Dondero, Acting P. J.

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CHARLES CURTIS GRISHAM, JR.,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>NOTRE DAME DE NAMUR<br>UNIVERSITY,<br><br>    Defendant and Respondent. | A135765<br><br>(San Mateo County<br>Super. Ct. No. CIV501683) |

Plaintiff has taken this appeal from a judgment in favor of defendant Notre Dame de Namur University (the University) following a trial before the court in his action for mandamus relief for his dismissal from the University's teaching credential program.  He claims the University failed to adhere to its contractual obligation to follow internal procedural rules before dismissing him, denied him procedural and substantive due process rights, and retaliated against him for exercising his free speech rights.  We conclude that the University properly followed the procedural rules for dismissal from the "Single Subject Credential Program" (the Program), did not deny plaintiff his procedural and substantive due process rights, and did not act in retaliation for plaintiff's criticism of the Program.  We therefore affirm the judgment.

## I.  STATEMENT OF FACTS AND PROCEDURAL HISTORY

In August 2006, plaintiff enrolled at the University as a graduate student in the Program, a one-year, graduate-level course of study designed to prepare students to obtain a single subject teaching credential.  The Program is accredited by the California Commission on Teacher Credentialing, which grants teaching credentials to students

approved by the University who have successfully completed the teacher education program. (Ed. Code, §§ 44001.1, 44227, subd. (b).) A single subject teaching credential authorizes the holder to teach specified subject matter courses in California high schools and most junior high schools.

The Program is administered by the University's school of education and leadership. According to the "Preliminary Single Subject Credential Program Handbook" (the Program Handbook), which serves as a guide for student teachers, interns, and supervisors in the Program, teacher candidates are supervised and evaluated by master teachers and a University supervisor, who meet periodically to discuss the progress made by the candidates. Conferences are called to respond to any conflicts that arise between student teachers and evaluators.

The progress of teacher candidates is also reviewed by the "Education Committee" (the Committee), composed of "undergraduate and graduate faculty, Dean of the School of Education and Leadership, Director and Credential Analyst," at meetings held twice each semester, or at any "special meeting" called "to review all cases involving unsatisfactory progress." Students "who are experiencing problems" receive a Committee report "identifying areas of difficulty." The Committee participates in all decisions related to Committee reports and evaluations of effectiveness. The Program Handbook provides that on rare occasions the Committee may meet and recommend an additional semester of student teaching for a candidate "to meet University expectations. Very rarely, the Committee may determine that a teacher candidate should not continue the program. The committee's decision is final unless appealed within fourteen (14) calendar days."

Plaintiff began his course of study in the English subject area in the Program in September 2006. He thereafter received high marks in classroom courses, and passed the "California Subject Examination for Teachers."

During the spring semester, 2007, plaintiff was given a student teaching assignment in a seventh grade class at the Hillview Middle School (Hillview) in Menlo Park. He was reviewed and evaluated by a master teacher at Hillview and his University

2

supervisor, Dr. Peter Dalton.  He received a very positive evaluation from the master teacher in February 2007, but in March 2007, Dr. Dalton commented that plaintiff "needed to follow the master teacher's rules of conduct."  In April 2007, plaintiff intervened when he witnessed a faculty member at Hillview chastise a misbehaving middle school student.  Plaintiff asserted that the discipline was an inappropriate threat of violence, but Dr. Dalton advised him not to report the incident.  Plaintiff felt compelled to report the perceived faculty abuse as a "mandated reporter," and did so to the school counselor Debbie Devoto.

By April 2007, plaintiff no longer had the support of his master teacher at Hillview, and Dr. Dalton facilitated a transfer to the Cunha Middle School in Half Moon Bay.  At Cunha, according to the principal and Dr. Dalton, plaintiff received positive evaluations of his lesson plans, instructional presentation, and rapport with students, but displayed deficiencies with classroom management skills, professional behavior, and interactions with staff.

Dr. Dalton suggested that plaintiff develop rules for respectful classroom behavior, and advised him that he would be given an "In Progress" grade until the completion of the school year and further observations by his supervisor—as required by state regulations.  Plaintiff responded by complaining to Dr. Joanne Rossi, dean of the school of education and leadership, that the evaluation standards were unfair, the University was "woefully out of compliance with the State requirements," operated a "shoddy program," and did "actual harm to future teachers."  At a meeting of the Committee on April 16, 2007, concerns were stated with plaintiff's student teaching performance, his unprofessional attitude, and his ability to meet expectations as a professional.  Apprehension about his ultimate success in the program was also expressed, although no action was taken.

On April 24, 2007, Dr. Dalton attempted to discuss with plaintiff his shortcomings related to classroom management, and methods for controlling student behavior.  Plaintiff became "antagonistic," and voiced displeasure with the instruction he was receiving.  The next day, the chair of the Committee, Dean Rossi, and Dr. Lu Chang, decided that issues

3

raised by plaintiff's attitude and conduct justified action by the Committee, beginning with a meeting with plaintiff to review concerns with his ability "to be successful in the vocation of teaching." Plaintiff was advised by Dr. Chang that a meeting was necessary to discuss his " 'anger management' " issue. Plaintiff voiced the opinion that he was the subject of retaliation and unfair evaluation for criticism of the program, and requested instructions for filing a grievance. Following review sessions a few days later, Dr. Dalton praised plaintiff's lesson plans and teaching methods, but again noted that plaintiff had problems with classroom organization, student disruptions, and sustaining a smooth flow of teaching to the whole class.

A Committee meeting was held on April 30, 2007. In attendance were plaintiff, his ombudsman appointed by the University, Dean Rossi, the Program directors, the credential analyst, and members of the faculty of other subject areas within the Program. Plaintiff was told that while his academic work was good quality, and his performance "with small groups" in the classroom was satisfactory, his success in the Program was threatened by disrespectful and "unprofessional behavior," including: disturbing remarks about an instructor and guest speaker in class; inappropriate intervention at school sites; rude remarks and derogatory e-mails to faculty, his supervisor and other University personnel; and bypassing established levels of communication.

The Committee recommended that plaintiff pursue other teaching programs at other universities or reconsider "the teaching profession." The conclusion of the meeting became contentious when Dean Rossi indicated her belief in response to plaintiff's inquiry that he was not suited to the teaching profession, and plaintiff replied that she was not fit to be dean of the Program. The minutes of the meeting indicate that the Committee determined plaintiff "violated university policies about misconduct," specifically section C of the "Notre Dame de Namur University Student Handbook & Academics Planner" (Student Handbook), "Non-Academic Misconduct," by verbally abusing University faculty and staff. The Committee authorized Dean Rossi to obtain written documentation of incidents of plaintiff's inappropriate conduct, and send notice to him "disqualifying him from the University" based on unprofessional behaviors.

4

In a letter dated May 3, 2007, Dean Rossi informed plaintiff of the Committee's decision "that effective immediately" his student teaching assignment was terminated, and he was "dismissed from the program effective today." According to the letter, disqualification was based on plaintiff's failure " 'to meet professional standards required by the specific degree, credential, or certificate program' " as stated in the "General Catalog," and disrespect by infringing on the rights of others through " 'inappropriate actions or communication' " in violation of the Student Handbook code of conduct. Specific examples of plaintiff's "repeated unprofessional and disrespectful behavior towards" University faculty and staff were recited. Plaintiff was advised that he was entitled to consult the grievance process outlined in the Student Handbook.

Plaintiff filed a "Petition to the Graduate Academic Standards and Curriculum Committee," in which he outlined violations of University policies by Dean Rossi, other members of the Committee, and Program faculty. On May 10, 2007, plaintiff sent a letter entitled "Notice of Student Grievance Complaint and Appeal" to Dr. Judith Greig, University provost, in which he appealed the decision of the Committee and gave notice of a grievance pursuant to the procedures specified in the Student Handbook. He requested an opportunity to make a personal appearance before the Committee, and asked for the University to provide him with all documents or guidelines pertinent to the review process.

Plaintiff's letter was treated by Provost Greig as an appeal of the determination of the Committee. Plaintiff was granted a personal appearance before the Committee on May 30, 2007, and advised to provide "any other materials" he wished for consideration as part of the appeal process. He was given copies of all prior Committee reports and minutes, student evaluations, and other documents considered by the Committee in arriving at the decision to dismiss him from the Program.

The Committee meeting on May 30, 2007, was attended by Dean Rossi, Program chair Barbara Kammerlohr, Dr. Dalton, and other Program faculty members. The minutes of the meeting reflect that plaintiff referred to the Committee members as a " 'group of mobsters' " controlled by Dean Rossi. When plaintiff was asked to proceed

5

with his presentation of information, he accused the Program of noncompliance with state standards for single subject credential education, admitted his criticism of the Program, particularly his placement at Hillview as a student teacher, and disparaged the evaluations by Dr. Dalton. He asked the Committee to consider an e-mail from Hillview counselor Debbie Devoto, who offered a positive assessment of his previous criticism of a faculty member at Hillview, and requested the principal of Hillview to write a letter on his behalf detailing the inappropriateness of his assignment there. Plaintiff engaged in considerable disparagement of the procedure and the Committee members before the meeting was concluded and he was excused.

Thereafter, the Committee members noted that plaintiff's continued contentious, unprofessional behavior, "tirades" in response to constructive feedback, numerous confrontations with faculty and staff, and difficulty in communication demonstrated a lack of professionalism required by the Program. The Committee report to University Provost Judith Greig stated that plaintiff did "not satisfy the standards" of the Program due to his demonstrated "inadequate ability to work with people from many diverse backgrounds and schools of thought." Plaintiff's appeal was denied and the decision to disqualify plaintiff from the Program due to "a failure to meet professional standards" was "reaffirmed."

Provost Greig notified plaintiff on June 19, 2007, that his appeal had been denied based on the Committee's decision that he "demonstrated a failure to meet professional standards warranting disqualification from the Program." The provost advised plaintiff that he was not entitled to any additional hearing under the student grievance procedure of the Student Handbook, to challenge the final "academic evaluative decision" to disqualify him from the University.

Following a meeting with the president of the University, Dr. John Oblack, plaintiff's "academic disqualification" from the University, as reflected in his transcript, remained unchanged. Due to perceived offensive and threatening remarks to faculty and administrators, plaintiff was declared "persona non grata" on the University campus and prohibited from appearing on the premises.

6

On December 20, 2010, plaintiff filed the present action for traditional and administrative mandamus, breach of contract and declaratory relief. He requested relief in the form of an order reinstating him in the Program, his due process right to a fair procedure prior to dismissal from the University, an order expunging the reference to academic disqualification from his record, lost wages and attorney fees.

Following a trial before the court, a statement of decision was issued on April 11, 2012, that denied plaintiff's claims for ordinary and administrative mandamus. The court determined that ordinary mandamus (Code Civ. Proc.,[2] § 1085), rather than administrative mandamus (§ 1094.5), was the appropriate statutory remedy, and in any event plaintiff failed to make the required evidentiary showing to support relief under either statute. The court found that the procedure followed to dismiss plaintiff was fair, complied with due process, and adhered to the University policies. The court further found the University's decision to dismiss plaintiff from the Program was supported by the evidence, was not arbitrary or capricious, and was not in retaliation for plaintiff's exercise of First Amendment rights. The parties stipulated that in light of the trial court's denial of the mandamus causes of action, plaintiff cannot prevail on his third and fourth causes of action for breach of contract and declaratory relief. Judgment in favor of defendant was filed, and this appeal followed.

## II. DISCUSSION

### A. *The Standard of Review*

Plaintiff urges us to undertake an independent review of the University's decision to dismiss him from the Program, in accordance with the standards for a petition for writ of *administrative* mandamus. He maintains that the University's "internal rules and regulations" detailed in the Student Handbook required a " 'full adversarial hearing' " to resolve the "charge of academic discipline," which was erroneously denied him by the University. He therefore claims "review by administrative mandamus" is the appropriate

---

[2] All further statutory references are to the Code of Civil Procedure, unless otherwise indicated.

7

remedy, and we engage in "de novo review" of his claim that the University failed to follow its own procedures or the requirements of due process before dismissing him from the Program.

We observe that the present case, like some others, falls into the "statutory cracks of writ review" provided by sections 1085 and 1094.5. (*Southern California Cement Masons Joint Apprenticeship Committee v. California Apprenticeship Council* (2013) 213 Cal.App.4th 1531, 1541 (*Cement Masons*).) " 'Administrative mandamus under section 1094.5 is appropriate to inquire "into the validity of any final administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal. . . ." [Citation.] By comparison, a writ of mandate under [Code of Civil Procedure] section 1085 is available where the petitioner has no plain, speedy and adequate alternative remedy; the respondent has a clear, present and usually ministerial duty to perform; and the petitioner has a clear, present and beneficial right to performance. [Citations.] Where a petition challenges an agency's failure to perform an act required by law rather than the conduct or result of an administrative hearing, the remedy is by ordinary mandate pursuant to Code of Civil Procedure section 1085, not by administrative mandate pursuant to section 1094.5. [Citation.]' [Citation.]" (*In re C.F.* (2011) 198 Cal.App.4th 454, 465.) It is generally recognized that traditional mandamus under section 1085 applies to "[q]uasi-legislative" decisions, defined as those involving " 'the formulation of a rule to be applied to all future cases,' " while administrative mandamus under section 1094.5 applies to "quasi-judicial" decisions, which involve " 'the actual application of such a rule to a specific set of existing facts.' " (*Friends of the Old Trees v. Department of Forestry & Fire Protection* (1997) 52 Cal.App.4th 1383, 1389.) "Administrative mandamus is properly employed when a hearing is required by law, even if the hearing is not held." (*Lanigan v. City of Los Angeles* (2011) 199 Cal.App.4th 1020, 1029.)

" ' "In reviewing a trial court's judgment on a petition for writ of ordinary mandate, the appellate court applies the substantial evidence test to the trial court's

8

factual findings, but exercises its independent judgment on legal issues, such as the interpretation of statutes. [Citation.]" [Citation.] Thus, to the extent that the trial court's decision does not turn on disputed facts, we review de novo the trial court's interpretation of the [statutory] . . . provisions at issue. [Citations.]' [Citation.]" (*Outfitter Properties, LLC v. Wildlife Conservation Bd*. (2012) 207 Cal.App.4th 237, 243–244.) On appeal from a writ of administrative mandate, "this court, just as the trial court, reviews the administrative record for 'a prejudicial abuse of discretion.' [Citations.] 'Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' [Citations.]" (*Citizens for East Shore Parks v. State Lands Com*. (2011) 202 Cal.App.4th 549, 557, fn. omitted.) Under administrative mandamus, we exercise our independent judgment as to questions of law, and apply the substantial evidence test to questions of fact. (*Lanigan v. City of Los Angeles, supra,* 199 Cal.App.4th at p. 1029; *Moore v. City of Los Angeles* (2007) 156 Cal.App.4th 373, 380.)

In the present case, a decision was made after an administrative hearing that was far more adjudicatory than legislative in nature, placing it in the natural domain of section 1094.5. Yet because the Commission was not required to hold a hearing before dismissing plaintiff, the decision does not fall within the literal language of that section, which applies only to decisions rendered "as the result of a proceeding in which by law a *hearing is required* to be given[ and] evidence is required to be taken" (§ 1094.5, subd. (a), italics added). As a result, it is not readily apparent which statutory form of writ relief and review should govern here.

We need not resolve this dilemma because the standard of review applicable to the particular issues raised by plaintiff is not dependent on the type of writ review employed. (See *State Bd. of Chiropractic Examiners v. Superior Court* (2009) 45 Cal.4th 963, 977 & fn. 3; *Cement Masons, supra*, 213 Cal.App.4th at p. 1541.) We will independently judge whether the University proceeded in a manner required by law by providing plaintiff with the appropriate review process and substantive and procedural due process. We will apply the substantial evidence test to the trial court's factual findings. (*Cement Masons,*

9

at pp. 1541–1542; *Citizens for East Shore Parks v. State Lands Com., supra*, 202 Cal.App.4th at p. 557; *Fat v. County of Sacramento* (2002) 97 Cal.App.4th 1270, 1277.)[3]

**B.** *The Proper Administrative Hearing Procedure Required by University Regulations*

Plaintiff claims that the University improperly and unfairly proceeded according to the Program Handbook, which did not afford him a full and formal evidentiary hearing. He submits that the Committee had "no jurisdiction" to decide the allegations against him. Instead, he asserts, the University was obligated to proceed according to the "Code of Student Conduct" spelled out in the Student Handbook, which provided him with "18 enumerated procedural rights," including the right to prior written notice of the charges and accusing witnesses, the right to present documentary evidence and witnesses to rebut the charges, the right to a written transcript of the proceedings, and the right to an appeal of an adverse decision before the University's vice president, with a review of the verbatim record of the hearing. He maintains that the University thus "violated its own written guarantees" to him as a student in a case of alleged "non-academic misconduct."

We have no quarrel with the settled proposition advanced by plaintiff that "[t]he basic relationship between a student and a private university . . . is contractual in nature." (*Zumbrun v. University of Southern California* (1972) 25 Cal.App.3d 1, 10; see also *Paulsen v. Golden Gate University* (1979) 25 Cal.3d 803, 811; *Kashmiri v. Regents of University of California* (2007) 156 Cal.App.4th 809, 823–824.) Whether by analogy to the law of associations, on the basis of a supposed contract between university and student, or simply as a matter of essential fairness in the somewhat one-sided relationship between the institution and the individual, "when a university has adopted a rule or guideline establishing the procedure to be followed in relation to suspension or expulsion that procedure must be substantially observed." (*Tedeschi v. Wagner College* (1980) 49 N.Y.2d 652, 660; see also *Clayton v. Trustees of Princeton University* (D.N.J. 1981)

---

[3] Plaintiff agrees that "there are only 'subtle differences in the scopes of judicial review' between administrative and traditional mandamus," which "appear to be of no import in the circumstances of this case."

10

519 F.Supp. 802, 804; *Harvey v. Palmer College of Chiropractic* (Iowa Ct.App. 1984) 363 N.W.2d 443, 445.) The University was bound by existing internal policies and procedures stated in the University's handbooks or other guidelines. (*Pomona College v. Superior Court* (1996) 45 Cal.App.4th 1716, 1727–1728.) Moreover, "Mandamus is available if a hearing is required by statute, an organization's internal rules and regulations, or due process." (*Id.* at p. 1727, fn. 10.)

The critical inquiry here is which procedures the University was contractually required to follow. Defendant submits that the procedures outlined in the Student Handbook govern his dismissal. The "Code of Student Conduct" section in the Student Handbook, specifies the code of conduct expected of students, and provides that a "student's inappropriate conduct" violates the code "whenever it is detrimental to the security, personal safety and/or employee and student welfare." Two forms of prohibited misconduct are described in the Student Handbook. "Academic Misconduct" includes plagiarism, cheating, fabrication of information, misuse of computer software, unauthorized use, forgery or duplication of a document, grade tampering, and the like, none of which are at all pertinent to plaintiff's case. Under the heading "Non-Academic Misconduct," the Student Handbook refers to abuse of alcohol or drugs, harassment, bullying, assault or hazing, disrespect through infringing on the rights of others or failure to comply with a lawful request by University staff, misconduct through vandalism or other actions related to University property, discrimination, commission of lewd or disruptive acts, and other specific behavior that discredited the University.

The Student Handbook states that disciplinary proceedings may be instituted against any student who violates criminal law or the code of conduct. A charge of violation of the code of conduct may be initiated in writing by any member of the University community. The University "Student Conduct Board" (the Board), consisting of one administrator, two faculty members, and two appointed students, hears and resolves cases of alleged violations of the code. For nonacademic misconduct cases, the student must be notified three days in advance of any formal meeting or hearing on the allegation, provided with documents and witnesses in support of the accusations,

11

accompanied by a nonattorney advisor at the hearing, and must be granted the right to present evidence or testimony. A single verbatim record of the hearing must be created and maintained. All decisions are by a majority of the Board present at the hearing. The criterion for the decision of the Board is "whether it is more likely or not that the Responding Student violated the Code of Conduct." The student must receive a written decision within seven days of the hearing, which includes a statement of the charges, a summary of the information presented at the hearing, the sanctions imposed, and the right to appeal.

The decision of the Board may be appealed, within 20 days of receipt, to the "Vice President for Campus Life" (vice president). The vice president reviews the verbatim transcript of the evidentiary hearing to determine whether the hearing was conducted fairly, whether the decision was based on "substantial information," whether the sanctions imposed were appropriate, or whether new information is sufficient to alter the decision. The vice president has authority to conduct an investigation, and must render a decision within seven days. The decision of the vice president is final, except in cases of expulsion, which may be further and finally appealed to the president.

Plaintiff was not subjected to discipline for acts that purportedly violated the code of student conduct articulated in the Student Handbook. No charge was filed against him for academic or nonacademic misconduct pursuant to the Student Handbook. Plaintiff's conduct as a student was not at issue. Instead, the discipline was initiated in accordance with the Program Handbook by plaintiff's master teachers and University supervisors at a meeting of the Committee, where concerns were expressed about his student teaching performance, his unprofessional attitude, and his prospects for ultimate success in the Program. While references were made during the course of the disciplinary process to plaintiff's violation of University nonacademic misconduct policies in the Student Handbook, his disrespectful behavior towards University and staff, and the grievance process outlined in the Student Handbook, the substance of the proceeding was not based on academic or nonacademic *misconduct* as delineated in the Student Handbook.

12

Plaintiff's dismissal was academic rather than disciplinary in nature, resting as it did on the academic judgment of school officials that he did not exhibit the necessary conduct and personal attributes to become a successful teaching candidate. (*Board of Curators of University of Missouri v. Horowitz* (1978) 435 U.S. 78, 89–90 (*Horowitz*); *Fenje v. Feld* (7th Cir. 2005) 398 F.3d 620, 624–625.) The entire focus of the University's action against plaintiff was upon performance that brought into question his ability to meet the professional standards of the Program. For academic dismissal actions within the Program, the University was not required to follow the distinct and unrelated Student Handbook procedures for disciplinary misconduct. The Student Handbook specifically provides that the grievance procedure stated therein "is not the appropriate procedure to follow when a student wants to appeal regarding an evaluation of academic performance."

The misconduct charged against plaintiff was also not of a nature that was appropriate for evaluation by the Board, which consists of an administrator, faculty members and students, none of whom possess the experience or expertise in the teaching field to properly assess plaintiff's progress in the Program and prospects as a successful teaching candidate. The appropriate forum for consideration of the accusations against plaintiff was the Committee, whose members were equipped to conduct the expert evaluation and judgment of educators. (*Horowitz, supra*, 435 U.S. 78, 89–90.) We conclude that under the circumstances presented the University complied with its internal procedural rules and guidelines in the Program Handbook for the disciplinary action that resulted in plaintiff's expulsion from the Program.

## C. *Plaintiff's Procedural Due Process Rights*

We turn to plaintiff's contention that he was denied procedural due process and basic fairness by the University's disciplinary action. He complains that the Committee was not an impartial, fair tribunal, but rather was comprised in part of "the very faculty and administrators" who raised the allegations of his unprofessional conduct and failure to meet professional standards. He submits that the Committee combined "the roles of accuser and tribunal," which denied him "any semblance of fair procedure." He also

13

complains of the Committee's failure to give him adequate notice of the proceedings, the right to call "his own witnesses," or a fair appeal before an independent body. In total, plaintiff argues that his "common-law right to fair procedure" was denied.

Due process is a flexible concept that calls for such procedural protections as the particular situation demands. (*Gilbert v. Homar* (1997) 520 U.S. 924, 930; *Morrissey v. Brewer* (1972) 408 U.S. 471, 481; *Civil Service Assn. v. City and County of San Francisco* (1978) 22 Cal.3d 552, 561.) "A determination whether administrative procedures 'are constitutionally sufficient requires analysis of the governmental and private interests that are affected. [Citations.]' [Citation.]" (*Gilbert v. City of Sunnyvale* (2005) 130 Cal.App.4th 1264, 1279.)

The United States Supreme Court in *Goss v. Lopez* (1975) 419 U.S. 565, 581, "held that due process requires, in connection with the suspension of a student from public school for disciplinary reasons, 'that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story.' " (*Horowitz, supra,* 435 U.S. 78, 85.) "The need for flexibility is well illustrated by the significant difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct. This difference calls for far less stringent procedural requirements in the case of an academic dismissal." (*Id.* at p. 86, fn. omitted.) "Academic evaluations of a student, in contrast to disciplinary determinations, bear little resemblance to the judicial and administrative factfinding proceedings to which we have traditionally attached a full-hearing requirement." (*Id.* at p. 89.)

Where, as here, dismissal is based on academic deficiencies rather than disciplinary reasons, "Procedural due process does not require a university to provide a student a formal hearing but is satisfied if the university informs the student of its dissatisfaction with the student's academic performance, it informs the student of the consequences of deficient performance, and a decision regarding the student's academic progress is careful and deliberate. [Citation.] When reviewing an academic decision for substantive due process, courts should show 'great respect for the faculty's professional

14

judgment' and may not override a faculty's academic decision unless it is 'such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.' [Citation.]" (*Lachtman v. Regents of University of California* (2007) 158 Cal.App.4th 187, 192 (*Lachtman*).) "The United States Supreme Court has established a student is not entitled to a formal hearing." (*Id*. at p. 201.) "Thus, under *Horowitz*, a university satisfies the demands of procedural due process if it informs the student of its dissatisfaction with the student's academic performance, it informs the student of the consequences of deficient performance, and a decision regarding the student's academic progress is careful and deliberate." (*Ibid.*)

Plaintiff was fully and repeatedly informed of the concerns of his master teachers and supervisors with his academic performance. The Committee then met to evaluate plaintiff's progress, and advised him of his perceived professional deficiencies. Dr. Dalton subsequently again discussed plaintiff's shortcomings related to classroom management and methods for controlling student behavior, followed by the Committee's meeting with plaintiff to review concerns with his ability " 'to be successful in the vocation of teaching.' " Soon thereafter Dr. Dalton repeated his concerns with plaintiff's classroom organization, student disruptions, and the flow of plaintiff's classes.

The Committee meeting was held on April 30, 2007, at which plaintiff appeared and was represented by his ombudsman appointed by the University. Plaintiff was told that his behavior was disrespectful and unprofessional, and he was not suited to continue as a teaching candidate in the Program. At the conclusion of the meeting the Committee authorized Dean Rossi to send notice to plaintiff of his disqualification from the Program based on unprofessional behavior. Plaintiff was then afforded an appeal hearing at which he was offered the opportunity to present the Committee with new information that reflected on the case. He was given copies of all prior Committee reports and minutes, student evaluations, and other documents considered by the Committee in arriving at the decision to dismiss him from the Program. At the appeal hearing, plaintiff offered little in the way of evidence, although the Committee did consider a supportive e-mail from

15

Hillview counselor Debbie Devoto. Plaintiff's presentation consisted almost exclusively of criticism of the Committee and the Program. Finally, plaintiff met with the University president, who declined after consideration of the case to change plaintiff's "academic disqualification."

We realize that plaintiff suffered a harsh sanction through disqualification from the Program, but the record demonstrates to us that he was given adequate prior notice of faculty dissatisfaction with his performance and of the possibility of dismissal. The Committee, although composed of members of the Program faculty and administrators, rendered a deliberate decision to dismiss plaintiff following careful consideration of his performance and conduct, and after granting plaintiff the opportunity to respond to the accusations against him. (*Harris v. Blake* (10th Cir. 1986) 798 F.2d 419, 422.) We find no suggestion in the record that the Committee was biased to a degree that precluded an objective, reasoned decision. We conclude that plaintiff received adequate procedural due process. (*Lachtman, supra,* 158 Cal.App.4th at p. 201.)

## D. *Plaintiff's Substantive Due Process Rights*

Plaintiff also complains that he was denied substantive due process. He claims the administrative record fails to provide "a fair basis for concluding that the charges" against him were "true or accurate." Plaintiff challenges the trial court's "uncritical reliance" on the administrative record "manufactured" by the Committee to support the decision to dismiss him from the Program, and claims the Committee's decision was "arbitrary, capricious and entirely lacking in evidentiary support."

"The guarantee of due process of law includes a substantive component" which prohibits infringement on certain "fundamental" interests. (*Washington v. Glucksberg* (1997) 521 U.S. 702, 721; *Reno v. Flores* (1993) 507 U.S. 292, 301–302; *Coshow v. City of Escondido* (2005) 132 Cal.App.4th 687, 708.) We recognize that plaintiff had a protectable property right in continued enrollment in the Program. (*Regents of University of Michigan v. Ewing* (1985) 474 U.S. 214, 223 (*Ewing*).) However, "In deciding whether a student's substantive due process rights have been violated, we start with the 'widely accepted rule of judicial nonintervention into the academic affairs of schools.'

16

[Citation.] ' "University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation." ' [Citation.] Judicial review of a university's academic decision is a 'narrow avenue' restrained by '[c]onsiderations of profound importance.' [Citation.]" (*Lachtman, supra,* 158 Cal.App.4th at pp. 203–204.)

A limited exception to nonintervention is recognized where the university has acted "arbitrarily or in bad faith." (*Paulsen v. Golden Gate University, supra,* 25 Cal.3d at p. 809; see also *Shuffer v. Board of Trustees* (1977) 67 Cal.App.3d 208, 219–220; *Wong v. Regents of University of California* (1971) 15 Cal.App.3d 823, 830–832.) "We may only overturn the university's decision if we find it to be arbitrary and capricious, not based upon academic criteria, and the result of irrelevant or discriminatory factors. [Citations.] We must uphold the university's decision 'unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.' [Citation.]" (*Banks v. Dominican College* (1995) 35 Cal.App.4th 1545, 1551 (*Banks*).)

The evidence before us supports the trial court's determination that plaintiff's dismissal did not violate his substantive due process rights. His performance in the clinical teaching program raised doubts on the part of both his master teacher and faculty supervisor about his suitability as a teaching candidate. When plaintiff was given recommendations to develop his teaching skills, he responded with anger and accusations rather than efforts to improve his classroom management skills, professional behavior, and interactions with staff. Instead, plaintiff continued to exhibit disrespectful and unprofessional behavior. As a result, the members of the Committee uniformly concluded after what appears to be conscientious reflection that he lacked the skills and demeanor necessary to remain in the teaching Program. As we read the record, the decision was based on academic criteria and professional judgment, not arbitrary, capricious or discriminatory factors. (*Ewing, supra*, 474 U.S. at pp. 223–225; *Paulsen v. Golden Gate University, supra,* 25 Cal.3d at pp. 809, 811; *Banks, supra,* 35 Cal.App.4th at p. 1553.) No denial of plaintiff's substantive due process rights occurred.

17

## E. *Plaintiff's Claim of Retaliatory Dismissal*

Plaintiff's final contention is that he was improperly dismissed in retaliation for exercising his "free speech" rights to criticize the Program. He argues that the University "violated the law and its own rules" by retaliating against him for "exercising rights of free speech." Plaintiff's argument relies on the "freedom of speech" guarantees in the United States and California Constitutions, along with Education Code section 94367, subdivision (a), which provides: "No private postsecondary educational institution shall make or enforce a rule subjecting a student to disciplinary sanctions solely on the basis of conduct that is speech or other communication that, when engaged in outside the campus or facility of a private postsecondary institution, is protected from governmental restriction by the First Amendment to the United States Constitution or Section 2 of Article I of the California Constitution."

A person's free speech rights under the federal and state Constitutions are not infringed unless there is state action. (*Lloyd Corp. v. Tanner* (1972) 407 U.S. 551, 567; *Golden Gateway Center v. Golden Gateway Tenants Assn.* (2001) 26 Cal.4th 1013, 1023.) Accordingly, a private school is not subject to constitutional scrutiny for infringing free speech rights unless the school's action "can fairly be seen as state action." (*Rendell-Baker v. Kohn* (1982) 457 U.S. 830, 838; *Caviness v. Horizon Community Learning Center* (9th Cir. 2010) 590 F.3d 806, 814–816.) " 'Education Code section 94367 et seq., prohibits private universities from disciplining students for *speech* that would be protected by the First Amendment [and article I, section 2 of the California Constitution] if made off campus.' [Citation.]" (*Yu v. University of La Verne* (2011) 196 Cal.App.4th 779, 788–789, italics added by *Yu*.) "[I]t creates *statutory* free speech rights for students of private postsecondary educational institutions." (*Id.* at p. 790.)

"A claim for retaliation for engaging in protected speech under the First Amendment requires proof that (1) the person was subjected to an adverse action; (2) the person had engaged in speech that was constitutionally protected because it touched on a matter of public concern; and (3) the protected speech was a substantial motivating factor for the adverse action." (*Lachtman, supra*, 158 Cal.App.4th at p. 214.) While plaintiff

18

exercised his right to criticize the Program, his dismissal was not in retaliation for the criticism. The evidence demonstrates that the Committee reached the decision to dismiss plaintiff on the basis of his unprofessional behavior that reflected adversely on his ability to successfully complete the Program, not because he reported his perception of inappropriate discipline or disparaged the University. His dismissal was unrelated to protected activity. Plaintiff did not establish a retaliatory dismissal.

### III. DISPOSITION

Accordingly, the judgment is affirmed.


_____
Dondero, Acting P. J.


We concur:


_____
Banke, J.


_____
Sepulveda, J.*


* Retired Associate Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19